**THE NEWS–JOURNAL CORPORATION,**
a Florida corporation,
Plaintiff–Appellant,

v.

**Honorable S. James FOXMAN, Circuit Judge, Seventh Judicial Circuit, State of Florida, Defendant–Appellee.**

No. 90–3469.

United States Court of Appeals,
Eleventh Circuit.

Aug. 30, 1991.

**1500**

Jonathan D. Kaney, Jr., Cobb, Cole & Bell, Daytona Beach, Fla., for plaintiff-appellant.

Louis F. Hubener, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for defendant-appellee.

Before JOHNSON and BIRCH, Circuit Judges, and MERHIGE *, Senior District Judge.

BIRCH, Circuit Judge:

This case presents a newspaper's First Amendment challenge to a restrictive order entered by a state court regarding extrajudicial statements by trial participants prior to the commencement of a sensational criminal trial. Upon the newspaper's application for injunctive relief, the federal district court dismissed the action for lack of jurisdiction based on *Younger* abstention. On the particular facts of this case, we affirm the district court's conclusion, although we expand upon the reasoning.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The events precipitating this case involve a conspiracy to commit murder in Daytona Beach, Florida. On November 4, 1989, plaintiff-appellant The News–Journal Corporation (News–Journal), publisher of a daily newspaper of general circulation in Volusia and Flagler Counties, and other area newspapers reported the shooting of Bryan Chase by Konstantinos X. Fotopoulos, who was awakened by Chase's shooting his wife, Lisa Fotopoulos, in the head while the couple slept. Lisa Fotopoulos recovered from the head wound.

Subsequently, a Volusia County grand jury indicted Fotopoulos on charges that he had hired Chase to murder his wife, that he had murdered Chase, and that he had solicited Chase and others to commit five previous attempts on the life of Lisa Fotopoulos. Additionally, Fotopoulos, in concert with Deidre Hunt, was charged with the murder of Mark Kevin Ramsey by tying him to a tree and shooting him to death. The shooting of Ramsey was recorded by Fotopoulos with a home video camera on a videocassette, which was confiscated by the police.

As the state criminal cases progressed and more details of the murders became known, the media, including the area newspapers and television stations, actively reported facts and developments.[1] The News–Journal published a story based on a telephone interview with Hunt from the Volusia County jail. In the interview,

---

* Honorable Robert R. Merhige, Jr., Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

1. Among the area newspaper articles submitted to the district court in an appendix to the request for injunctive relief were the following articles published by the News–Journal: *Autopsy performed on man killed in shooting*, Nov. 7, 1989; *Husband held in murder-for-hire*, (date obscured); *Husband tried, failed 3 times to have wife killed, police say*, Nov. 9, 1989; *Friends say couple seemed happily married*, Nov. 9, 1989; *Lisa Fotopoulos talks to police*, Nov. 11, 1989; *Boardwalk buzzing over woman's ties to shooting*, Nov. 11, 1989; *Charges of murder-for-hire stun 'aunt'*, Nov. 14, 1989; *Fotopoulos is innocent mother says*, Nov. 15, 1989; *Fourth suspect charged in murder-for-hire plot*, Nov. 15, 1989; *Fight for normal life motivates Fotopoulos*, Nov. 21, 1989; *2 police officers investigated for dealings with Fotopoulos*, Nov. 21, 1989.

Hunt incriminated herself and Fotopoulos, while she attempted to exculpate Yvonne Henderson, who had tried to kill Lisa Fotopoulos. A television station televised a similar interview with Hunt. The News–Journal also published a story based on an interview with Fotopoulos's mother, who proclaimed her son's innocence.

On the evening of December 20, 1989, two television stations broadcasting in the Daytona Beach area aired syndicated shows depicting reenactments of the two murders. The front-page News–Journal story for that date was entitled *Murder-for-hire case causes media blitz*. The article pictured all of the defendants and their respective attorneys, and advised readers of a television presentation that evening.[2]

By December 22, 1989, the news media had reported that Fotopoulos had attempted to hire several individuals to kill his wife; that at least six unsuccessful attempts had been made to kill Lisa Fotopoulos before Chase entered the couple's bedroom on November 4, 1989; that persons who had been solicited for this murder had come forward and would testify; that Hunt had confessed to her participation in the plot to kill Lisa Fotopoulos and also had confessed that she and Fotopoulos had tied Kevin Ramsey to a tree and shot him to death while videotaping the scene; that Hunt had led police to the body of Kevin Ramsey; and that police had recovered the videotape showing the murder as well as other tangible evidence, including the Bryan Chase murder weapon. Additionally, a vivid account of the videotaped depiction of the murder of Kevin Ramsey was released as part of search warrant affidavits. The news media obtained their information from interviews with law enforcement officers, prosecution and defense counsel, defendant Hunt, Lisa Fotopoulos and potential trial witnesses.

Defendant-appellee Honorable S. James Foxman presided over the consolidated cases against Fotopoulos and the three indicted conspirators. Troubled by the extensive media coverage regarding the murder cases, Judge Foxman scheduled a hearing for December 22, 1989, to consider a proposed restrictive order in the case. Present at the hearing were the four defendants and their attorneys, counsel for the state, an attorney for the News–Journal and its primary reporter for the case, and an attorney representing an Orlando newspaper and television station. Asking for suggestions from the counsel, Judge Foxman explained the reasons for his concern regarding the media publicity:

Let me say a few things into the record; the reasons why we're here. *The Court is concerned about the tremendous pretrial publicity this case has received. I'm specifically concerned that there's a likelihood that prejudicial news prior to trial will prevent a fair trial.* There has been tremendous publicity, the newspaper articles locally, throughout central Florida. This Court had the misfortune to observe earlier this week at home on TV, on national TV news, a—an enactment on TV of two of the alleged murders in this case. The enactment referred to a third uncharged murder and other uncharged crimes. And I really can't ignore that. It's basically that airing on TV that has prompted the Court to call this hearing.

Basically, folks, *it's my job to make sure that everybody here, the Defendants and the State, get a fair trial, and I'm concerned about the Court's ability to give them a fair trial in light of the publicity.*

---

2. The front-page story for the News–Journal on December 20, 1989, was divided into two articles that appeared on the front page. The first article, entitled *'Current Affair' to air segment tonight on case* began as follows: "The bizarre Fotopoulos murder-for-hire case will be featured on tonight's edition of 'A Current Affair,' a syndicated quasi-news program, shown locally on WESH–TV, Channel 2, at 7 p.m." The second story, entitled *Defense says talks with client may have been tape recorded,* has the following description of Fotopoulos's attorney, Thomas Mott's actions after the reading of the indictment for the four defendants who pleaded not guilty: "After the reading of the indictment, Mott rose to condemn what he called sensationalized media coverage of the case. He also accused lawmen of secretly tape recording jailhouse conversations with his client." App. A–115–16.

I want to stress that I have not yet entered the order that's attached to the notice of hearing, and I may not enter it. What it is, it's an attempt on the Court's part to tone down the case, let's get on with the litigation in a fair manner.

I'm going to give the Defendants, the State, and both counsel [the two attorneys representing the media, including the News–Journal] opportunity to participate in this. You may present evidence, you may object, correct.

What I'd really like ... are for some suggestions as to how we may proceed from now on with the litigation in this case, so I'm open to suggestions, and if you have any I'm certainly going to listen to them.

*I also want to stress one other thing. This order is a restrictive order, it's not technically a gag order. I'm not telling the media to do something or not to do something. It's aimed at the participants in the litigation of this cause.*

App. A–7–8 (transcript of the hearing before Judge Foxman, Dec. 22, 1989) (emphasis added).

In turn, counsel for the four defendants explained to Judge Foxman their concerns relating to the defense of their individual clients because of the prejudicial publicity and endorsed the proposed restrictive order.[3] The state and law enforcement offi-

---

**3.** Counsel for defendant Fotopoulos addressed the fair trial concerns of his client:

The practical or bottom line in this case is that Mr. Konstantine [sic] Fotopoulos has been tried and convicted in the newspapers and in the media. He is at this time presumed guilty by this community, and at this time, this early stage of this case, there has been a travesty of justice because this man cannot get a fair trial in this community at this time.

And it's far-fetched to think that any time in the near future that he's going to be able to get a fair trial in this community. Or perhaps anywhere else. And the reason for that is, because he has been tried by spectacle and by ordeal in the media.

. . . .

Before charges were even formally filed against Mr. Fotopoulos, there were newspaper articles, media releases, electronic media releases so voluminous that they can't be easily recounted. I have a file here just of the newspaper articles, and not an exhaustive file either.

But the press coverage of this case has been constant and has been intense. It's not a situation where once a month there's a little article in the paper. It's headline news constantly.

. . . .

So what we have is the media surreptitiously giving false legitimacy to evidence. They basically aren't telling it like it is.

Konstantine [sic] Fotopoulos doesn't stand a chance at having a fair trial in this community. And the reason is because of the circus atmosphere that is present in this community. . . . *[I]t's this Court's duty and inherent power to assure that judicial proceedings are conducted fairly and impartially and we fully concur and support in the Court's entering of this order.*

App. A–10–11, 12–13 (emphasis added). Additionally, counsel for defendant Fotopoulos de-

scribed and quoted from a News–Journal article regarding a state attorney briefing reporters:

In the foreground is a package containing weapons believed used in the murder. As part of that article, at the very end of it, Mr. Damore [state attorney] is quoted as saying, in regard to finding this tape that's been referred to ... adding that the tape immeasurably helps their case against Fotopoulos. Regarding Ramsey's shooting, quote, "I thought somehow the Lord was watching over us in this investigation", he said.

I believe that that type of a statement so far exceeds the parameters of what is professionally accepted, that there is no question but that's improper. . . . What we don't want is to inject those types of things into this trial process, into these proceedings.

That's the type of thing that has to stop, Judge, and your order will do it. *And I encourage you to enter your order as proposed without modifying it to these standards that apply to lawyers, not to lay people.*

App. A–67 (emphasis added).

Counsel for defendant James [charged with attempt to kill Lisa Fotopoulos] addressed the detrimental effect of attorneys arguing their cases to the press:

Your, Honor, I do realize that the press is not a place to argue your case and that the Defendants should not be tried in the press, but I believe that *the right to a fair trial is one of the most fundamental of all freedoms and it has to be preserved at all costs and I believe this restrictive order will do that.*

App. A–14 (emphasis added).

Counsel for defendant Henderson addressed fair trial concerns and the media's technique of obtaining information from the various defense attorneys:

At this time, the nature of this case has obviously become one out of the—well out of the norm; that the media attention of [sic] this case has obviously caused the case to be tried in the media, and at this point in time,

we're very close—hopefully we're not past the point—but we're certainly very close to the point where it's going to be very difficult to receive a fair trial, to receive a fair trial in this community at least, and the far-reaching nature of the media attention obviously is going to make it difficult to maybe receive a fair trial anywhere in this State.

. . . .

Another concern that I have that specifically occurs in these types of cases is the occasion of having the media talk to one attorney and then approach another attorney with statements that may or may not have been said by the previous attorney, and in essence, playing one attorney or one party in the case off of the other. And trying to generate statements and comments and information through that means, that is a very dangerous thing. And perhaps the most dangerous part of it is when the media will use the statements made by a defense attorney or the State Attorney to approach the other side. And then what happens is we end up in a war of words between the defense and the State through the media. And that makes it very difficult to control a case and to have an even keel between the defense and the State, which certainly in a case of the magnitude of this case, it's very important that things be dealt with on an even keel, in a way that we can try to resolve and have this case tried fairly. . . . *[T]his order does not restrict the press. The press is still free to disseminate as much information as they desire.*

*What this does is restrict the parties, the attorneys and the other people associated with the court process from disseminating information to the press, and I think at this point in time that's a very valuable thing.*

The information that has come out in the press is certainly many times not accurate, and if the public is going to read and believe that information, it's going to become a burden for us as the defense attorneys to overcome at a trial, to make them believe that—or understand that that is not the truth, and that certainly should not be our burden in a trial; to convince a jury that what they heard outside of the courtroom is not the truth.

App. A–15, 16–17 (emphasis added).

Counsel for defendant Hunt expressed concern that a fair trial for his client was questionable not only because of the televised reenactment of the murder, but also because of the interview of his client by a News–Journal reporter without the presence of her attorney:

We had a conference, as Your Honor will recall, among the defense attorneys concerning this proposed order, and at that time we were not aware that there would be a bombshell forthcoming, via Inside Edition and Current Affair, which presented a detailed and supposedly accurate reenactment of the crime.

I've had the response from several clients and other people that have just practically stopped me on the street saying—they alluded

to the tape: "How in the world are you going to defend somebody when we saw the murder on TV," thinking that what they had witnessed, since the tape was announced to be in the media's possession, not noticing that—the very brief announcement, "This is a reenactment," feeling obviously that they had seen the actual confiscated tape and had actually seen the crime.

. . . .

In so far as Miss Hunt's concerned, I have not made the decision whether I would even request a change of venue in this case. I think all of that is very premature, or even get to the point of whether or not her position at this point is so jeopardized in this county because of the national scope of this publicity, where could it be moved to? That's another problem that we're going to have to face down the road.

*But in any event, Your Honor, I do concur in theory with what Your Honor is attempting to do, to avoid problems for all of us in the future.*

. . . .

[I]t appears that the press has to some extent over-exceeded their bounds thus far, and I begin to wrestle with the problem when you get to the new journalism approach, when a reporter ceases to be reporting the news and actually becomes an investigator and the collector and disseminator of evidence, subject to discovery, as any other police officer or investigator.

. . . .

[M]y client was contacted by the media and at that time that she was contacted, she was represented by the Public Defender's Office, and the Public Defender's Office in representing Mrs. Hunt, was not advised or notified that these interviews were going to take place.

. . . .

[T]here was correspondence with the media to Mrs. Hunt calling her DeeDee, requesting that the media be put on her visitation list. There were interviews and also films shot of Mrs. Hunt.

. . . .

[T]he Public Defender's Office who was representing her, or Ray Cass, her attorney at that point, was never notified, contacted, he did not approve any such visitation and did not condone it. Specifically, he had instructed against it. Mrs. Hunt was never advised prior to these conversations or interviews or videotapes that these [sic] information can and would be used against her in a court of law. She was not . . . advised that she had a right to consult with an attorney during these interviews or that the interviews would be terminated if she needed to ask some questions with an attorney.

We have requested . . . that these tapes and notes of the interviews be furnished. We've got the same argument that the Court is going to hear today, that this information is privileged, that it can be furnished and that they

cers encouraged a broad order to ensure that there would be no interpretive questions concerning which individuals were included.[4] Although agreeing that there had been extensive pretrial publicity in the case, the attorney for the News–Journal protested that the proposed order, limiting reporting to court proceedings, would impede the efforts of the newspaper to inform the public adequately concerning the prosecution of the consolidated cases.[5]

After listening to the positions of all of the counsel present, Judge Foxman concluded that "there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial," and that he was "going to enter a restrictive order." App. A–89–90. He invited the attorneys into his chambers to assist in finalizing his proposed restrictive order. The restrictive order entered by Judge Foxman on December 22, 1989, provides in pertinent part:

> have a right to talk to a client represented by [an] attorney without his knowledge and consent, a client that is charged with capital murder, very possibly facing the electric chair.
>
> Then, ... the [News–Journal] reporter who took the interview has intentionally destroyed her notes. I have a copy of a letter ... thereby preventing, if she is ever called to testify, the intentional and voluntary destruction of her notes of that interview would prevent us, firstly, from verifying the authenticity of what my client said, would also prevent her from refreshing her recollection, and ergo we think that this should be suppressed. But that will be subject to a later motion, but the only reason I mention that to the Court is that these type of things must be prevented.
>
> · · · ·
>
> [W]e are faced at this juncture with a situation where the investigative reporting has been completely one-sided at this juncture. They have had a reenactment of the crime, they have had very concise statements from the investi[gati]ng officers, to wit, ... that we have a good or excellent case, that we've solved this case, that we have the Defendants in custody, and all of the media of presentation thus far has been so one-sided.
> App. A–18–20, 22–24, 26–27.

**4.** In supporting the proposed restrictive order, the state attorney explained the need for an expansive order:
> [W]e [the State Attorney's office, the investigating officers and sheriff] support the Court's order. We will certainly honor the order as drafted by the Court and I feel it is in the best interest of all parties that the Court issue a

**1.** The media and the individual reporters have standing to contest any restrictive order.

**2.** This case has been the subject of great and unusual pre-trial publicity. Newspaper articles too numerous to count have been published concerning the case. A recent national and local telecast showed a reenactment of both alleged murders, alluded to a third uncharged murder, and mentioned other uncharged crimes. Interviews with several involved counsel, the police, and at least one defendant have been broadcast.

**3.** This case is also highly unusual—far from other murder cases. This Court is reluctant to articulate why it is so unusual because to do so would cause the same harm the Court is trying to avoid. Suffice it to say that this case has caused and will cause, great media attention.[6]

**4.** It is the duty of this Court to ensure that all involved receive a fair trial. Un-

> restrictive order and that that restrictive order should be a broad order, an order which will cover so that it will not be left to interpretation of individual counsel or witness the intent of the Court's order, because I believe the Court will find itself in a quagmire of interpretation of individuals as to what they can and cannot say.
> App. A–55.

**5.** The News–Journal attorney complained that
> the accuracy and the cogency of a reporter's coverage is greatly impaired if ... he or she is constrained to what transpired in open forum. If they [reporters] can't ask people to explain what they meant, to elucidate, to [give] background, if they can't speak with police officers that are way up the echelon that are not to be witnesses, to be oriented and put into context, their coverage will suffer, the interest of free trial will suffer, and I say the order is, as you contemplate now, is too broad and we'd be happy to cooperate with you if you'd ask us to inspect—
> App. A–45.

**6.** At the hearing regarding the proposed restrictive order, Judge Foxman revealed that the unusual aspect of the case referred to the videotaped murder:
> [T]here's no secret about that paragraph two [three]. There's—this case and what makes it so highly unusual, there's an alleged videotape of a murder. And I guess there's no reason why I can't say it, everybody knows it.
> App. A–40.

fortunately, *the Court concludes there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial.*

5. The Court determines that a Restrictive Order is necessary. The authority for the Order is found in *Sheppard vs. Maxwell*, 384 US 333, 86 S.Ct. 1507, 16 L.Ed.2nd, 600 (1966); *State Ex Rel. Miami Herald vs. McIntosh*, 340 So.2d 904 (Fl.1977); and *Florida Freedom Newspapers v. McCrary*, 520 So.2d 32 (Fl. 1988). *The court is not aware of any less restrictive measures it could take at this time to ensure a fair trial.*

Now, Therefore, it is ORDERED AND ADJUDGED as follows:

1. *During the pendency of this case and until final determination in the trial court, prosecution, counsel for the defense, witnesses, defendants, court personnel, members of the Daytona Beach Police Department, Volusia County Sheriff's Department, the FDLE [Florida Department of Law Enforcement], and all persons affiliated therewith shall not release, make, or authorize release of any extra judicial statements for dissemination by any means of public communication, relating to any matters having to do with this case.*

2. This Order applies to all parties having any responsibility for the prosecution and defense in this case. Contempt powers of the Court will be used to ensure compliance with this Order.

3. All counsel are ordered to attach a copy of this Order to all trial or discovery subpoenas issued and served in this case; and to reflect service of same on all returns filed.

4. This Order is not intended to preclude any witness from discussing any matter in connection with the case with any of the attorneys representing the defense or State, or any proper representative of such attorney.

App. A–1–2 (footnotes omitted) (emphasis added). Paragraph one of the restrictive order contains the following relevant footnote:

*This prohibition shall not apply to media reporters—even if subpoenaed as witnesses in this case. To include the reporters would involve First Amendment considerations that the Court is not prepared to deal with at this time.*

App. A–2–n. 3 (emphasis added).

Judge Foxman denied the News–Journal's motion for rehearing concerning the restrictive order. On January 8, 1990, the News–Journal petitioned the Florida Fifth District Court of Appeal for certiorari review of the restrictive order, pursuant to Florida Rule of Appellate Procedure 9.100(d), which entitles a party to expedited review of "an order excluding the press or public from access to any proceeding ... not required by law to be confidential...." Fla.R.App.P. 9.100(d)(1). Concurrently, the News–Journal moved for a stay of the restrictive order pending review. On January 11, 1990, the Fifth District Court of Appeal issued a show cause order, requesting that briefs be filed. The News–Journal filed a supplemental motion to stay under Rule 9.100(d). At no time did the News–Journal specifically request expedited review.

The last brief was filed in the Fifth District Court of Appeal on January 29, 1990. With no ruling from that court by March 27, 1990, the News–Journal filed in federal district court for the Middle District of Florida, a complaint under 42 U.S.C. § 1983 on First Amendment grounds and a motion for a preliminary injunction to enjoin enforcement of the restrictive order. On March 30, 1990, the Fifth District Court of Appeal, having accorded common law certiorari review, issued its opinion granting the petition for review of the restrictive order in two respects. *News–Journal Corp. v. Foxman*, 559 So.2d 1227 (Fla. 5th DCA 1990) (per curiam). First, the appellate court struck "and all persons affiliated therewith," following the identification of classes of individuals and law enforcement agencies encompassed by the restrictive order because the court determined that this language was too vague to describe the class of people affected by the order. *Id.* at 1228. Second, the court struck the provision for effectiveness of the order until

"final determination in the trial court," because the duration of the restrictive order through trial was too extensive and unnecessary. *Id.* The appellate court reasoned that the purpose of the restrictive order was to safeguard the defendants' right to a fair trial by an impartial jury. Once the jury is selected, other measures, such as sequestration, are available to the trial court to protect the jury from prejudicial publicity. The court held that the restrictive order would terminate when a jury was impaneled and sequestered. Other than these two stricken provisions, the restrictive order was upheld. Therefore, the News–Journal's petition was granted in part and denied in part by the Fifth District Court of Appeal.

On April 4, 1990, the federal district court abstained from exercising jurisdiction over the case under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and dismissed the complaint. The New–Journal moved for reconsideration and clarification in the Fifth District Court of Appeal on April 9, 1990, and filed in federal district court a motion for reconsideration of the dismissal of its complaint with an amended complaint seeking injunctive relief against enforcement of the restrictive order on April 13, 1990. In denying the News–Journal's motion for reconsideration on April 26, 1990, the federal district court acknowledged that, while the restrictive order could have been framed to restrain only prejudicial speech and not the speech of law enforcement personnel who were not witnesses in the case, these issues could have been consolidated in the motion for rehearing before the Fifth District Court of Appeal. The federal district court found that the News–Journal had an adequate opportunity to address these concerns in the state court system. Therefore, the district court concluded that it must abstain from interfering in ongoing state criminal proceedings under *Younger.*

Following the district court's ruling, Judge Foxman granted defendant Fotopoulos's motion for a change of venue and the News–Journal's motion to vacate the restrictive order. Subsequently, the Fifth District Court of Appeal denied rehearing without an opinion and the Florida Supreme Court denied review without an opinion. The other three defendants pled guilty. Counsel informed this court at oral argument that defendant Fotopoulos had been convicted, and that all of the defendants had been sentenced to death. The News–Journal, a media nonparty to the prosecution, appeals the sole issue of whether the district court properly abstained under *Younger* from enjoining enforcement of the state court restrictive order prohibiting extrajudicial statements by the trial participants.[7]

## II. DISCUSSION

### A. Mootness

■ In this case, Judge Foxman vacated the restrictive order contested by the News–Journal, and adjudication of the four defendants is complete through sentencing. In order to meet the constitutional requirement of a case or controversy and to overcome mootness, this case must be within one of the exceptions to the mootness doctrine: "(1) 'where the issues are capable of repetition, yet evading review'; (2) 'where an appellant has taken all steps necessary to perfect the appeal and to preserve the status quo before the dispute becomes moot'; and (3) 'where the trial court's order will have possible collateral legal consequences.'" *National Broadcasting Co. v. Communications Workers,* 860 F.2d 1022, 1023 (11th Cir.1988) (quoting *B & B Chemical Co. v. United States E.P.A.,* 806 F.2d 987, 990 (11th Cir.1986)); *see* U.S. Const. art. III, § 2 (the case or controversy requirement for federal jurisdiction). Although the restrictive order about which the News–Journal complained has been vacated, the potential recurrence of a similar restrictive order involving the News–Journal in another sensational criminal trial is a distinct possibility. Because we have de-

---

7. No other media organization has joined the News–Journal in its pursuit of this action in state or federal court.

termined that this case meets the prerequisites for the first exception to mootness, we need not address the other two. *See National Broadcasting Co.,* 860 F.2d at 1023.

A two-part test must be met to satisfy the "capable of repetition, yet evading review" exception to mootness: (1) there must be a " 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party," and a showing that (2) the "challenged action was in its duration too short to be fully litigated prior to its cessation or expiration." *Murphy v. Hunt,* 455 U.S. 478, 482–83, 102 S.Ct. 1181, 1183–84, 71 L.Ed.2d 353 (per curiam) (1982) (citations omitted); *National Solid Wastes Management Ass'n v. Alabama Dep't of Envtl. Management,* 924 F.2d 1001, 1003 (11th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991). Although the Supreme Court has determined that the first part of the test can be satisfied "based on expectations that, while reasonable, [a]re hardly demonstrably probable," it is sufficient to show that likelihood exists that the News–Journal potentially can be deprived " 'in a similar way' " in the future. *Honig v. Doe,* 484 U.S. 305, 319 n. 6, 323, 108 S.Ct. 592, 601 n. 6, 604, 98 L.Ed.2d 686 (1988) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983)); *see National Solid Wastes Management Ass'n,* 924 F.2d at 1003. In *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976),

the Court determined that a pretrial order restricting press reporting prior to impaneling the jury in a criminal trial was not moot, although the order had expired. The Court reasoned that the defendant's conviction could be overturned on appeal, presenting the possibility of a similar order at a new trial, and a dispute over a similar order was likely to occur in future criminal trials. As we have observed, the potential for a restrictive order in another publicized criminal case with the same First Amendment contentions raised by the News–Journal is not unlikely. The News–Journal has met the first part of the test.

Because neither the Florida courts nor the federal courts had completed their review of the restrictive order before it was vacated, we find that the News–Journal also satisfies the second part of the test. *See National Solid Wastes Management Ass'n,* 924 F.2d at 1003–04. Thus, the News–Journal has satisfied both parts of the "capable of repetition, yet evading review" test. This case is not moot, and we proceed with our analysis.

## B. *Younger* Abstention

Under traditional equitable principles for injunctive relief and in the interest of federal and state comity, the Supreme Court established that federal courts should not intervene in an ongoing state criminal prosecution, "when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." [8] *Younger v. Harris,* 401 U.S. 37,

---

**8.** *Younger* recognized narrow exceptions to its fundamental rule of abstinence in the limited cases of a showing of bad faith prosecution, harassment, or the flagrant and patent violations of express constitutional prohibitions, facially evident in a challenged statute. 401 U.S. at 53–54, 91 S.Ct. at 755; *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 611, 95 S.Ct. 1200, 1212, 43 L.Ed.2d 482 (1975); *First Alabama Bank v. Parsons Steel, Inc.,* 825 F.2d 1475, 1482 (11th Cir. 1987), *cert. denied,* 484 U.S. 1060, 108 S.Ct. 1015, 98 L.Ed.2d 980 (1988); *see Redner v. Citrus County,* 919 F.2d 646, 649 (11th Cir.1990) (discussing the original three exceptions to *Younger* and the Court's extensions of this abstention doctrine within the criminal context); *see also* E. Chemerinsky, *Federal Jurisdiction* § 13.4 at 655 (1989) (The exceptional situations meeting

the requirements of the *Younger* exceptions are rare; "*Younger* is not an absolute ban on federal court injunctions, but it is quite close."). Because these exceptions are not present in this case, we need not address them. Additionally, the Court has extended the *Younger* abstention doctrine to ongoing state civil proceedings when "the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government." *Pennzoil Co. v. Texaco Inc.,* 481 U.S. 1, 11, 107 S.Ct. 1519, 1526, 95 L.Ed.2d 1 (1987); *see Cate v. Oldham,* 707 F.2d 1176, 1183 (11th Cir.1983) ("Application of the *Younger* doctrine to ongoing state civil proceedings has been limited to those civil actions in aid of criminal jurisdiction or involving enforcement-type proceedings in which vital

43–44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971). This "settled law," intended to preserve the independence of our concurrent judicial systems, requires "our sensitive consideration of ongoing proceedings in state courts" and "that a federal court 'tread lightly' when a state proceeding is already underway." *Blalock v. United States,* 844 F.2d 1546, 1549 (11th Cir.1988) (per curiam); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu,* 675 F.2d 1169, 1173 (11th Cir.1982). Aside from intervening in a criminal trial, the former Fifth Circuit explained that enjoining preliminary proceedings "would have the effect of a federal court telling a state court how to run an ongoing criminal prosecution" and that such relief "would have the intrusive impact on the state proceeding that *Younger* and its progeny abhorred." [9] *Williams v. Rubiera,* 539 F.2d 470, 473, 474 (5th Cir.1976), *cert. denied,* 431 U.S.

931, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977). We, therefore, must examine this case carefully to determine if the district court was correct in its decision that *Younger* abstention was warranted.

■ Because the *Younger* doctrine is founded on the premise that the pending state court proceedings will provide an adequate forum for litigating federal issues, our first consideration is whether the News–Journal had an adequate state forum. *See Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423, 435, 102 S.Ct. 2515, 2522–23, 73 L.Ed.2d 116 (1982). *Younger* advises that, when state proceedings are pending, constitutional issues should be raised in that forum, " 'unless it plainly appears that this course would not afford adequate protection.' " [10] 401 U.S. at 45, 91 S.Ct. at 751

---

interests of the state *qua* state are involved."); *see also First Alabama Bank,* 825 F.2d at 1482–83 (citing civil cases in which important state interests were concerned and *Younger* abstention was appropriate).

**9.** Concerning the capability of state courts to adjudicate federal constitutional questions in our system of federalism, the *Williams* court explained:

> The need to allow state courts to adjudicate federal constitutional questions in cases pending before those tribunals is the workable result of comity and federalism.... [T]here is no reason to doubt that state courts can adequately entertain plaintiff's claims. Article VI of the United States Constitution "declares that 'the Judges in every State shall be bound' by the Federal Constitution, laws and treaties." *Huffman,* 420 U.S. at 611, 95 S.Ct. at 1211. Thus the state courts share equivalently with the federal courts the responsibility of protecting constitutional guarantees. Absent facts to the contrary it must be presumed that this obligation will be fulfilled. *Williams,* 539 F.2d at 474 (citation omitted).

**10.** The impetus for the *Younger* doctrine is that a party has an adequate state forum in which to raise federal claims. *See* 401 U.S. at 49, 91 S.Ct. at 753. The Court, however, has recognized situations when an adequate state forum is unavailable. In *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), the Court affirmed a district court's injunction to halt proceedings before the Alabama Board of Optometry, the statutory licensing body for the practice of optometry in the state. The Court upheld the

district court's conclusion that the members of the Alabama Board of Optometry, consisting of independent practitioners, had a pecuniary interest in suspending the licenses of optometrists employed by others and not those of practitioners unemployed by others. The Court concluded that federal courts may intervene in pending state proceedings if state tribunals are biased on the issue before them. *Cf. Richards v. Emanuel County Hosp. Auth.,* 603 F.Supp. 81, 84–85 (S.D. Ga.1984) (Osteopath suspended from hospital staff privileges was not comparable to *Gibson* because losing staff privileges does not prevent a doctor from practicing his profession as does revoking his license.).

The Court, however, has emphasized the difficulty of proving bias in state courts. In *Kugler v. Helfant,* 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975), a state court judge contended that members of the state supreme court were so involved in his case that he could not obtain an unbiased hearing. The Supreme Court disagreed that the state courts could not resolve the constitutional claims fairly and stressed the judicial disqualification procedures and changes in the state supreme court's membership. Citing *Kugler,* this court has advised that "[w]here a federal court is asked to interfere with pending state court proceedings it must proceed with caution, taking into account general considerations of federalism and, in particular, the likelihood of seriously disrupting the legitimate functioning of the judicial system of the state." *Ultracashmere House, Ltd. v. Meyer,* 664 F.2d 1176, 1180 (11th Cir. Dec. 1981).

In addition to bias within a state court system, the Supreme Court has found state courts to be inadequate if state procedures are unconstitutional. In *Gerstein v. Pugh,* 420 U.S. 103, 95

(quoting *Fenner v. Boykin,* 271 U.S. 240, 244, 46 S.Ct. 492, 493, 70 L.Ed. 927 (1926)). Under Florida Rule of Appellate Procedure 9.100(d), the News–Journal petitioned the Fifth District Court of Appeal on January 8, 1990, for review of the restrictive order and for a stay of the order pending review. On January 11, 1990, the Fifth District Court of Appeal requested briefing, which was completed on January 29, 1990. The News–Journal, which filed a supplemental motion with the Fifth District Court of Appeal pursuant to Appellate Rule 9.100(d), has complained in this action that the Florida appellate court failed to give its petition an expedited review as required under that procedural rule.

While Rule 9.100(d) appears to require expedited review [11] of a petition to review *"an order excluding the press or public from access to any proceeding "* not legally required to be confidential, we find that the restrictive order at issue is not encompassed by this rule.[12] Fla.R.App.P. 9.100(d)(1) (emphasis added), (2). Judge Foxman's order specifically states that it does not exclude any member of the media from judicial proceedings. Because the News–Journal elected to proceed under a procedural rule inapplicable to the restrictive order about which it complains, it cannot fault the Florida appellate court for not according it expedited review under Rule 9.100(d). The Florida appellate court states that it reviewed the News–Journal's petition under common law certiorari and does not mention Rule 9.100(d), implicitly finding that rule inapplicable. *See* Fla.R.App.P.

S.Ct. 854, 43 L.Ed.2d 54 (1975), accused individuals were detained in Florida jails without a determination of probable cause. Because of the absence of preliminary hearings, the detainees did not have a state forum in which to present their constitutional claims. The Supreme Court determined that the Florida procedure violated the detainees' Fourth Amendment rights because there was no requirement of a timely judicial determination of probable cause as a prerequisite to detention pending trial. The Court explained that *Younger* did not foreclose the federal injunction requiring judicial hearings before pretrial detention because "[t]he order to hold preliminary hearings could not prejudice the conduct of the trial on the merits." 420 U.S. at 108 n. 9, 95 S.Ct. at 860 n. 9; *see Luckey v. Harris,* 860 F.2d 1012, 1017 (11th Cir.1988), *cert. denied,* — U.S. —, 110 S.Ct. 2562, 109 L.Ed.2d 744 (1990). Rarely do demonstrable bias or unconstitutional proceedings exist in state courts making that judicial forum inadequate for federal constitutional claims. *See* Chemerinsky, *Federal Jurisdiction* § 13.4 at 655; *see also Williams,* 539 F.2d at 474–75 (discussing *Gibson, Kugler,* and *Gerstein* relative to *Younger* ).

11. In pertinent part, Florida Rule of Appellate Procedure 9.100(d)(2) provides: "The court shall *immediately* consider the petition [to review an order excluding the press or public from access to any proceeding not legally required to be confidential] to determine whether a stay of proceedings in the lower tribunal is appropriate...." Fla.R.App.P. 9.100(d)(2) (emphasis added).

12. Florida courts have interpreted literally Rule 9.100(d), regarding exclusion of the press from judicial proceedings. In *Florida Publishing Co. v. Brooke,* 576 So.2d 842 (Fla. 1st DCA 1991)

(per curiam), the newspaper petitioner sought to publish a letter involved in a dependency hearing, although the trial court had ordered that publication of the letter was prohibited. Regarding the newspaper's challenge to the judge's order under Rule 9.100(d), the Florida appellate court concluded that the petition sought certiorari review:

> We acknowledge that there is authority for us to take jurisdiction of this cause as a petition to review an order excluding the press or public from a proceeding or judicial records. *See Sarasota–Herald Tribune v. J.T.J.,* 502 So.2d 930 (Fla. 2d DCA 1987); *Florida Freedom Newspapers, Inc. v. McCrary,* 497 So.2d 652 (Fla. 1st DCA 1986), *approved,* 520 So.2d 32 (Fla.1988); *Miami Herald Publishing Co. v. Morphonios,* 467 So.2d 1026 (Fla. 3d DCA 1985). *We prefer to read the rule literally, however.* As the petitioners complain of an order that restrains publication of information in their possession, rather than an order limiting their access to information, *we elect instead to treat the petition as one seeking a writ of certiorari.*

*Id.* at 844–45 (emphasis added). Similarly, a Florida appellate court explained:

> Rule 9.100(d)(1) provides for an expedited review of an order *excluding* the press or public from access to any judicial record not required by law to be confidential. Petitioner [Florida Publishing Company] is not seeking review of an order *excluding* the press from a judicial record but has instead sought review of stay orders....

*In re Grand Jury Presentment,* 534 So.2d 905, 907 (Fla. 1st DCA 1988) (footnote omitted) (emphasis in original). Accordingly, we conclude that the News–Journal has attempted to claim expedited review under Rule 9.100(d), when that appellate rule is inapplicable because the

9.100(c) (regarding petitions for common law certiorari). Additionally, the News–Journal never specifically requested expedited review. Therefore, the News–Journal's argument that it did not receive adequate review in state court because the Fifth District Court of Appeal did not give its petition an expedited review under Rule 9.100(d) must fail.

Moreover, "[t]he date of filing of the federal complaint is the relevant date for purposes of determining *Younger's* applicability" because "the Supreme Court held that *Younger* applies if state court proceedings were pending at the time of the filing of the federal complaint." *Liedel v. Juvenile Court*, 891 F.2d 1542, 1546 n. 6 (11th Cir.1990) (citing *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 17, 107 S.Ct. 1519, 1529, 95 L.Ed.2d 1 (1987)). In this case, the News–Journal filed its federal action on March 27, 1990, while its petition for review of the restrictive order was pending before the intermediate Florida appellate court. Significantly, the Fifth District Court of Appeal issued its decision striking phrases regarding the scope and duration of the restrictive order on March 30, 1990. Abstaining under *Younger* and dismissing the case, the district court noted that the News–Journal had not exhausted its remedies within the state court system because the Fifth District Court of Appeal had entered its order subsequent to the News–Journal's filing its federal action, and the News–Journal could request a rehearing in that court. Because the News–Journal had an opportunity to present its federal claims in the state courts, the district court abstained under *Younger*. *See Juidice v. Vail*, 430 U.S. 327, 337, 97 S.Ct. 1211, 1218, 51 L.Ed.2d 376 (1977) (After a petitioner

has had an *"opportunity"* to present federal claims in state court, "[n]o more is required to invoke *Younger* abstention." (emphasis in original)). Procedurally, the district court acted appropriately under *Younger* to abstain from exercising jurisdiction in this case with respect to the News–Journal's original complaint and petition for preliminary injunction because the case was pending for review of the same federal issues in state court.

Following amendment of the restrictive order by the Florida appellate court and the federal district court's declining to intervene under *Younger*, the News–Journal moved for rehearing in the Fifth District Court of Appeal on April 9, 1990, and for reconsideration in the district court on April 13, 1990. We note that the News–Journal's motion for rehearing in the state court was pending when it moved for reconsideration in federal district court. For the same reasons that we have discussed, the district court could have abstained under *Younger* as it did for the News–Journal's original petition. Although the News–Journal apparently did not consider the state court's ruling sufficiently extensive, "the considerations of comity and federalism which underlie *Younger* permit no truncation of the exhaustion requirement merely because the losing party in the state court of general jurisdiction believes that his chances of success on appeal are not auspicious." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 610, 95 S.Ct. 1200, 1211, 43 L.Ed.2d 482 (1975). The denials of rehearing and review respectively by the Fifth District Court of Appeal and the Florida Supreme Court occurred after the federal district court denied reconsideration.[13]

---

News–Journal has not been excluded from any judicial proceedings in this case.

**13.** Under the *Rooker–Feldman* doctrine, federal district courts may not review final decisions of a state court. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). Commenting on the purpose of the *Rooker–Feldman* doctrine, this court has stated that "because federal review of state court decisions is entrusted solely to the Supreme Court, they [federal district courts] may not decide

federal issues that are raised in state proceedings and 'inextricably intertwined' with the state court's judgment." *Wood v. Orange County*, 715 F.2d 1543, 1546 (11th Cir.1983) (quoting *Feldman*, 460 U.S. at 486, 103 S.Ct. at 1317), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984); *see Liedel*, 891 F.2d at 1545. The *Wood* court did recognize an exception to the *Rooker–Feldman* doctrine, when there is no reasonable opportunity to raise the issue in state court. 715 F.2d at 1547. In this case, the decision of the Fifth District Court of Appeal was not final until rehearing was denied and review was denied by the Florida Supreme Court. Not

The state courts did rule on the restrictive order, albeit not to the satisfaction of the News–Journal. While the News–Journal was entitled to review of its federal claims in state court, it was not guaranteed its desired result.

■ In denying the News–Journal's motion for reconsideration based on *Younger*, the district court also commented upon the substance, particularly the scope, of the restrictive order. In essence, the district court analyzed the restrictive order under the First Amendment, although it abstained under *Younger*. Any substantive commentary and analysis is inconsistent with abstention for lack of jurisdiction based on *Younger*.

■ The only *Younger* abstention concerns in this case to be analyzed are the adequacy of the state forum and the alleged irreparable injury to the News–Journal resulting from the restrictive order. Having found that the News–Journal had an adequate state forum, we turn to the irreparable injury issue. The *Younger* court stressed that the irreparable injury necessary to overcome abstention is "the traditional prerequisite to obtaining an injunction" with the additional requirement that the injury be great and immediate. 401 U.S. at 46, 91 S.Ct. at 751. As in the case of injunctive relief, the responsibility

of establishing irreparable injury is upon the movant.[14] The Court explained that "the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution." *Id.*

Initially, we note that the *Younger* doctrine generally applies to *parties* to the criminal prosecution and that the News–Journal is not a party to the consolidated criminal prosecutions in this case. Nevertheless, a *Younger* analysis is appropriate where, as in this case, the injunction sought from federal court impermissibly would restrict the ability of the trial court to impanel an impartial jury, and, thereby, interfere with the court's ability and duty to conduct a fair criminal trial.[15] *See Williams*, 539 F.2d at 473 (Because *Younger* is based upon "the fundamental policy against federal interference with state criminal prosecutions," this circuit has determined that a federal court will not grant relief that has the effect of "telling a state court how to run an ongoing criminal prosecution...."). The apparent irreparable injury claimed by the News–Journal as a result of the restrictive order is its alleged First Amendment deprivation of being unable to interview the trial participants, including the defendants, their counsel, and law enforcement personnel, and thereby to

only was the News–Journal's request for injunctive relief premature under *Younger* because state court review was incomplete, but also, upon obtaining finality, review in federal district court would have been inappropriate under the *Rooker–Feldman* doctrine because "federal district courts may not decide federal issues that are "'inextricably intertwined'" with a state court's judgment. *Liedel*, 891 F.2d at 1545.

14. To prevail on a motion for preliminary injunction, the plaintiff has the burden of proving: "(1) a substantial likelihood of success on the merits; (2) *a substantial threat of irreparable injury*; (3) its own injury outweighs the injury to [the defendant]; and (4) the injunction would not disserve the public interest." *Tally–Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1022 (11th Cir.1989) (per curiam) (emphasis added). As an "'extraordinary and drastic remedy,'" a preliminary injunction is not granted unless the movant clearly satisfies the burden of persuasion as to these four prerequisites. *National Distrib. Co. v. James B. Beam Distilling Co.*, 845 F.2d 307, 309 (11th Cir.1988) (quoting

*United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983)).

15. In *Connecticut Magazine v. Moraghan*, 676 F.Supp. 38 (D.Conn.1987), factually analogous to this case, the district court did not abstain under *Younger* and granted a preliminary injunction enjoining the enforcement of an order precluding extrajudicial statements by the trial attorneys. The district court in that case determined that, because the plaintiff magazine was not a party to the criminal prosecution, its interests were not intertwined with those of the defendant state court judge, who entered the order. We distinguish this case because an adequate state remedy was unavailable to the magazine in *Connecticut Magazine*, and we have concluded that enjoining the restrictive order in this case would have impaired the state trial court's ability to obtain an impartial jury to preserve the Sixth Amendment rights of the defendants. While the News–Journal would have us segregate and isolate the Sixth Amendment rights of the defendants, we decline to do so.

provide running commentary to the public concerning the case.

While "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," the Supreme Court has held that "[t]he right to speak and publish does not carry with it the unrestrained right to gather information." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965). "[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665, 684, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972). " '[A] newsgathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom. But the line is drawn at the courthouse door; and within, a reporter's constitutional rights are no greater than those of any other member of the public.' " *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 609, 98 S.Ct. 1306, 1318, 55 L.Ed.2d 570 (1978) (quoting *Estes v. Texas*, 381 U.S. 532, 589, 85 S.Ct. 1628, 1663, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring)).

Moreover, when First Amendment claims impinge upon the Sixth Amendment right to a trial by an impartial jury, asserted First Amendment interests must yield to the "most fundamental of all freedoms," the right to a fair trial for the accused. *Estes*, 381 U.S. at 540, 85 S.Ct. at 1632; *see In re Application of Dow Jones & Co.*, 842 F.2d 603, 609 (2d Cir.), *cert. denied*, 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988) ("When the exercise of free press rights actually tramples upon Sixth Amendment rights, the former must nonetheless yield to the latter."). "Newspapers, in the enjoyment of their constitutional rights, may not deprive accused persons of their right to fair trial." *Shepherd v. Florida*, 341 U.S. 50, 53, 71 S.Ct. 549, 550, 95 L.Ed. 740 (1951). To guarantee the Sixth Amendment right to a fair trial, "[t]he Court has placed an *affirmative duty* on trial courts to guard against prejudicial pretrial publicity." *United States v. No-*

*riega*, 917 F.2d 1543, 1549 (11th Cir.) (per curiam), *cert. denied*, —— U.S. ——, 111 S.Ct. 451, 112 L.Ed.2d 432 (1990): *see Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907) ("The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.").

The Supreme Court views prior restraints *directed to the press* with a heavy presumption against their constitutionality. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 570, 96 S.Ct. 2791, 2808, 49 L.Ed.2d 683 (1976); *New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (discussing the constitutional problems with prior restraints specifically against the press). The Second Circuit, in upholding a restrictive order on trial participants in the widely publicized criminal trial of officials of the Wedtech Corporation, delineated that "there is a fundamental difference between a gag order challenged by the individual gagged and one challenged by a third party; an order objected to by the former is properly characterized as a prior restraint, one opposed solely by the latter is not." *In re Dow Jones & Co.*, 842 F.2d at 609; *see Nebraska Press*, 427 U.S. at 564, 96 S.Ct. at 2805 (orders prohibiting the extrajudicial commentary of trial participants are less restrictive than prior restraints on the press for averting the effect of prejudicial pretrial publicity); *see also Gentile v. State Bar*, —— U.S. ——, ——, 111 S.Ct. 2720, 2744, 115 L.Ed.2d 888 (1991) ("[T]he speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press.... Lawyers representing clients in pending cases are key participants in the criminal justice system, and the State may demand some adherence to the precepts of that system in regulating their speech as well as their conduct."). Significantly, the Supreme Court has suggested a restrictive order limiting extrajudicial commentary of trial participants as

an alternative to a prior restraint on the media.[16] *Sheppard v. Maxwell,* 384 U.S. 333, 361, 86 S.Ct. 1507, 1521, 16 L.Ed.2d 600 (1966).

16. Aside from the media's encroachment on the defendant's Sixth Amendment rights at trial, the Supreme Court found that pretrial reporting contributed to its conclusion that Dr. Samuel Sheppard was denied a fair trial for the murder of his pregnant wife, and suggested that a restrictive order directed at trial participants would have been a workable preventative measure:

> For months the virulent publicity about Sheppard and the murder had made the case notorious. Charges and countercharges were aired in the news media besides those for which Sheppard was called to trial. In addition, only three months before trial, Sheppard was examined for more than five hours without counsel during a three-day inquest which ended in a public brawl. The inquest was televised live from a high school gymnasium seating hundreds of people.
>
> . . . .
>
> Indeed, every court that has considered this case, save the court that tried it, has deplored the manner in which the news media inflamed and prejudiced the public.
>
> . . . .
>
> From the very inception of the proceedings the judge announced that neither he nor anyone else could restrict prejudicial news accounts.
>
> . . . .
>
> [T]he court should have made some effort to control the release of leads, information, and gossip to the press by police officers, witnesses, and the counsel for both sides. Much of the information thus disclosed was inaccurate, leading to groundless rumors and confusion.
>
> . . . .
>
> *[I]t is obvious that the judge should have further sought to alleviate this problem by imposing control over the statements made to the news media by counsel, witnesses, and especially the Coroner and police officers.*
>
> . . . .
>
> Moreover, the newspapers described in detail clues that had been found by the police, but not put into the record.
> The fact that many of the prejudicial news items can be traced to the prosecution, as well as the defense, aggravates the judge's failure to take any action. Effective control of these sources—concededly within the court's power—might well have prevented the divulgence of inaccurate information, rumors, and accusations that made up much of the inflammatory publicity, at least after Sheppard's indictment.
> *More specifically, the trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official*

In *Sheppard,* the Court explained its concern with the threat posed to the fair trial rights of a criminal defendant in a highly

> *which divulged prejudicial matters,* such as the refusal of Sheppard to submit to interrogation or take any lie detector tests; any statement made by Sheppard to officials; the identity of prospective witnesses or their probable testimony; any belief in guilt or innocence; or like statements concerning the merits of the case. *Being advised of the great public interest in the case, the mass coverage of the press, and the potential prejudicial impact of publicity, the court could also have requested the appropriate city and county officials to promulgate a regulation with respect to dissemination of information about the case by their employees. . . . Had the judge, the other officers of the court, and the police placed the interest of justice first, the news media would have soon learned to be content with the task of reporting the case as it unfolded in the courtroom—not pieced together from extrajudicial statements.*

*Sheppard,* 384 U.S. at 354, 356, 357, 359, 360, 361–62, 86 S.Ct. at 1518, 1519, 1520, 1521, 1522 (citations omitted) (footnotes omitted) (emphasis added). One commentator has found that a gag order on trial participants is a feasible alternative to a prior restraint on the media in a highly publicized criminal trial because the other alternatives do not sufficiently safeguard the fair trial rights of a defendant. Stabile, *Free Press–Fair Trial: Can They Be Reconciled in a Highly Publicized Criminal Case?,* 79 Geo.L.J. 337 (1990). Postponement may encroach on the accused's right to a speedy trial and may actually increase publicity in a case of great public interest; change of venue involves delay presenting the problems associated with postponement, local communities have an interest in local adjudication, and a highly publicized criminal case likely will cause prejudicial information to be disseminated nationally, rendering change of venue ineffective; voir dire cannot remove individuals who have read previous newspaper accounts and a larger jury pool may result in a greater number of people who have been exposed to prejudicial publicity or to a delay in voir dire with an enhanced opportunity for improper publicity to occur; jury sequestration not only is a drastic measure, requiring the jurors to compensate for the publicized actions of trial participants, but also lengthy jury sequestration can cause the bias of resentment, the desire to end deliberations, and cannot remove prejudice from publicity prior to impanelment; and jury instructions may be ineffective regardless of pretrial publicity because the great detail present in jury instructions in a highly publicized criminal trial may not highlight precisely the issues that the jurors are being instructed not to consider. *Id.* at 343–45.

publicized case by pervasive pretrial publicity of comments by trial participants:

> From the cases coming here we note that unfair and prejudicial news comment on pending trials has become increasingly prevalent. Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances.... [R]eversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. *Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function.* Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures.

384 U.S. at 362, 363, 86 S.Ct. at 1522 (emphasis added). In *Nebraska Press,* the Court endorsed the *Sheppard* recommendations as useful aids to the "major responsibility" of a trial judge in mitigating the effects of pretrial publicity as opposed to entering a prior restraint against the press.

*Nebraska Press,* 427 U.S. at 555, 96 S.Ct. at 2801. The Court stated that "[t]he capacity of the jury eventually impaneled to decide the case fairly is influenced by the tone and extent of the publicity, which is in part, and often in large part, shaped by what attorneys, police, and other officials do to precipitate news coverage." 427 U.S. at 554–55, 96 S.Ct. at 2800–01.

As circuit justice, Chief Justice Rehnquist denied the stay of a state trial court's order preventing trial participants from speaking with the press in an alleged organized crime murder trial that had generated widespread publicity. *KPNX Broadcasting Co. v. Arizona Superior Court,* 459 U.S. 1302, 103 S.Ct. 584, 74 L.Ed.2d 498 (1982). Based upon the trial court's having followed the direction of *Sheppard* in restricting the trial participants' communication with the press and yet not restricting press coverage of court proceedings, Chief Justice Rehnquist found that the First and Sixth Amendments had been accommodated appropriately in selecting the least restrictive method of controlling the extensive publicity.[17] Observing that the "only performance" should be conducted in the courtroom, the Chief Justice noted that

> [t]he fact that media coverage has transformed events such as professional sports contests into a framework designed to accommodate that coverage does not mean that the First Amendment requires criminal trials to undergo the same transformation. The mere potential for confusion if unregulated communication between trial participants and the press at a heavily covered trial were permitted is enough to warrant a mea-

17. Although application for stay in that case did not involve *Younger,* the application to the Supreme Court preceded oral argument scheduled by the Arizona Supreme Court. We note that Chief Justice Rehnquist considered the same concerns presented in this case under *Younger* of exhaustion of state remedies and irreparable injury:

> Given the procedural posture of this case, it would seem that in order for a stay to be granted before the case is heard by the highest court of the State, there should be a risk of irreparable injury together with a demonstrable departure on the part of the trial court

> from the law laid down in our cases. I simply do not find those elements to be present here. The orders at issue in this case do not prohibit the reporting of any facts on the public record. The trial has never been closed, and all the proceedings may be reported and commented upon. With respect to the court's order barring communication between trial participants and the press, it seems to me that the ... language from *Sheppard* ... goes far towards sustaining the action of the trial court....

*KPNX Broadcasting,* 459 U.S. at 1306, 103 S.Ct. at 586.

sure such as the trial judge took in this case.

459 U.S. at 1306–07, 103 S.Ct. at 586–87. The Court now has given direction to the *dicta* of *Sheppard* in *Gentile*. With reference to the above-quoted passage from *Sheppard*, the Court stated that "[w]e expressly contemplated that *the speech of those participating before the courts could be limited.*"[18] *Gentile*, —— U.S. at ——, 111 S.Ct. at 2743 (footnote omitted) (emphasis in original).

Under the restrictive order in this case, the News–Journal was given its constitutional right to attend and to report all information regarding the criminal prosecution occurring in court. Its First Amendment rights did not extend to interviews of the trial participants, when such interviews and subsequent reporting had evidenced to Judge Foxman the potential inability of impaneling an impartial jury. He conducted a full hearing before entering the restrictive order, and he concluded that there was no less restrictive means of safeguarding the defendants' Sixth Amendment rights. *See In re Subpoena to Testify Before Grand Jury*, 864 F.2d 1559, 1564 (11th Cir.1989) (This court upheld a district court's order restraining counsel, parties, witnesses, and the clerk of court from disclosing information and testimony from an ongoing grand jury investigation, when the district court had held a hearing and determined that there was a "compelling necessity" for the order.). Most significantly, counsel for all defendants and the state

18. We recognize that *Gentile* did not involve a restrictive order on the communications of trial participants with the press, but analysis of the Nevada Supreme Court rule prohibiting an attorney from making extrajudicial statements to the press, when he reasonably should know that such statements have a "substantial likelihood of materially prejudicing" an adjudicative proceeding. The attorney in *Gentile* called a press conference the day after the indictment of his client in a highly publicized case, "to counter public opinion which he perceived as adverse to his client, to fight back against the perceived efforts of the prosecution to poison the prospective juror pool, and to publicly present his clients's side of the case." —— U.S. at ——, 111 S.Ct. at 2739. The Court concluded that the attorney conscientiously had abided by the rule, and reversed the state supreme court decision that he should be disciplined.

The distinctions between this case and *Gentile* are significant. *Gentile* involved a state supreme court rule governing the conduct of members of the bar of that state, while we examine a state trial court's restrictive order entered in a particular case and directed to all trial participants. Because of their legal training, attorneys are knowledgeable regarding which extrajudicial communications are likely to be prejudicial. The other trial participants encompassed by the restrictive order in this case did not have such legal discernment and expertise. Given the public attention generated by this case, defendants, witnesses and law enforcement personnel were eager to talk with the press concerning their particular views. While attorneys can be governed by state supreme court or bar rules, other trial participants do not have these guidelines. Therefore, a restrictive order tailored to preclude prejudicial commentary could well have been ineffective with respect to the other trial participants. In con-

trast to the *Gentile* attorney who specifically desired and called the press conference in that case, all of the defense counsel and the prosecution encouraged and agreed to the entry of the restrictive order by Judge Foxman because of the great media attention that had been devoted to the case. The News–Journal, which was not a party to the litigation, as was the attorney in *Gentile*, was the only member of the media that objected to Judge Foxman's entry of the restrictive order.

We also are cognizant of the division in circuit authority regarding the appropriate standard for evaluating restrictive orders imposed on trial participants. *Compare In re Application of Dow Jones & Co.*, 842 F.2d 603 (2d Cir.), cert. denied, 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988) *and Radio & Television News Ass'n v. United States District Court*, 781 F.2d 1443 (9th Cir.1986) (In challenges to restrictive orders directed to trial participants and challenged by the media only, the Second and Ninth Circuits have used a "reasonable likelihood" standard for determining that pretrial publicity would prejudice a defendant's right to a fair trial.) *with CBS Inc. v. Young*, 522 F.2d 234 (6th Cir.1975) (The Sixth Circuit uses the high standard of "clear and present danger" to analyze a restrictive order directed to trial participants and considers such an order a prior restraint.). In dissenting to the denial of certiorari in *In re Dow Jones*, Justice White noted the conflicting circuit decisions concerning the analysis of a restrictive order directed to the trial participants. 488 U.S. at 946–48, 109 S.Ct. at 377–78. Although Judge Foxman used the reasonable likelihood standard in the restrictive order in this case, we need not address these different standards before the Court resolves this issue. This case is before us on the issue of the appropriateness of the district court's abstention based on *Younger*, and it is to *Younger* considerations that we confine our analysis.

had encouraged and agreed to the restrictive order, the impetus for which was the sensationalized reporting of the media, including the News–Journal.

"Abstention questions must be resolved by close attention to the facts of each case." *Fields v. Rockdale County,* 785 F.2d 1558, 1560 (11th Cir.), *cert. denied,* 479 U.S. 984, 107 S.Ct. 571, 93 L.Ed.2d 575 (1986). In this case, the sensationalized reporting of extrajudicial statements of trial participants by the News–Journal and the other media clearly created a strong probability of prejudicing the prosecution of the defendants. The detrimental effects of the reporting ultimately resulted in a change of venue for the trial of Fotopoulos. "Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges v. California,* 314 U.S. 252, 271, 62 S.Ct. 190, 197, 86 L.Ed. 192 (1941). "Moreover, the existence of a 'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action." *Younger,* 401 U.S. at 51, 91 S.Ct. at 754.

Under the *Younger* considerations applicable to this case, we conclude that the News–Journal had an adequate state forum, and that it failed to show specific irreparable injury as a result of the restrictive order, which was not directed to the press, but to the trial participants. The nonparty status of the News–Journal should not eliminate the application of the *Younger* doctrine where failure to apply such analysis would preclude consideration of the Sixth Amendment rights of defendants in the underlying litigation. The News–Journal particularly has been deficient in demonstrating its claimed First Amendment deprivation, when it has been accorded its constitutional attendance and reporting rights and has not been directly limited in any manner by Judge Foxman's restrictive order, designed to preserve the overriding Sixth Amendment right of the criminal defendants in this case to an impartial jury. "It is not asking too much to suggest that those who exercise First Amendment rights in newspapers or broadcasting enterprises direct some effort to

protect the rights of an accused to a fair trial by unbiased jurors." *Nebraska Press,* 427 U.S. at 560, 96 S.Ct. at 2803.

Under our analysis herein, the district court's decision to abstain under *Younger* from enjoining the state court restrictive order directed to trial participants in this case is AFFIRMED.