In re Application of DOW JONES & COMPANY, INC., the New York Times Company, CBS Inc., National Broadcasting Company, Inc., New York News Inc., the Associated Press, and Newsday, Inc., Applicants.

Appeal of DOW JONES & COMPANY, INC., the New York Times Company, CBS Inc., National Broadcasting Company, Inc., the Associated Press, and Newsday, Inc., Applicants–Appellants.

UNITED STATES of America,

v.

Stanley SIMON, Mario Biaggi, Peter Neglia, John Mariotta, Bernard Ehrlich, Richard Biaggi and Ronald Betso, Defendants,

Stanley Simon, Peter Neglia, John Mariotta, Bernard Ehrlich and Richard Biaggi, Defendants–Appellees.

No. 322, Docket 87–7644.

United States Court of Appeals, Second Circuit.

Argued Sept. 16, 1987.

Decided March 14, 1988.

Robert D. Sack, New York City (Mitchell A. Karlan, Richard J. Tofel, Stuart D. Karle, Gibson, Dunn & Crutcher, New York City, of counsel), for applicant-appellant Dow Jones & Co., Inc.

Deborah R. Linfield, George Freeman, The New York Times Co., Douglas P. Jacobs, CBS Inc., Roberta R. Brackman, Nat. Broadcasting Co., Inc., Nancy A. Brown, Rogers & Wells for The Associated Press, Robert Lloyd Raskopf, Harry Walters, Townley & Updike, New York City, for Newsday, Inc., of counsel, on the brief for applicants-appellants.

Maurice N. Nessen, New York City (Cecilia Loving–Sloane, David Z. Seide, Kramer, Levin, Nessen, Kamin & Frankel, New York City, of counsel), for defendant-appellee Stanley Simon.

Arthur Eisenberg, New York City, on brief for amicus curiae New York Civ. Liberties Union.

Before CARDAMONE, WINTER and MINER, Circuit Judges.

CARDAMONE, Circuit Judge:

This is an appeal by news agencies from an order restraining trial participants in a criminal case from speaking with the press. Appellants urge that secrecy of the sort imposed by this "gag" order seriously compromises the right of the press to publish. In this case the district court was faced with what it described as a "shameful abuse of grand jury secrecy," which it concluded was reasonably likely to influence the outcome of defendants' trial. Because it is the obligation of the federal courts to ensure that a defendant receive a fair trial by an impartial jury, the district court entered the subject restraining order upon finding that this case is a "widely publicized or sensational" one within the meaning of Local Criminal Rule 7(c), which authorizes such an order when "extrajudicial statements by parties and witnesses" are likely to interfere with that right. We affirm.

## BACKGROUND

Dow Jones & Company, The New York Times Company, CBS Inc., National Broadcasting Company, Inc., The Associated Press, and Newsday (collectively, "news agencies" or "appellants") appeal from the subject restraining order entered in the United States District Court for the Southern District of New York (Cannella, J.) on July 10, 1987, which denied their motion to vacate an earlier order entered in the district court on April 23, 1987, and from an order of the district court (Motley, J.) dated July 27, 1987 that denied a motion to vacate the July 10 order. The news agencies ask us to vacate the July 10 order that modified the April 23 order and reverse the decision under which the order was entered, *United States v. Simon,* 664 F.Supp. 780 (S.D.N.Y.1987).

The *Simon* case stems from a wide-ranging investigation into the affairs of Wedtech, a South Bronx, New York military contractor that is charged with fraudulently qualifying for "no-bid" federal contracts set aside for minority-owned companies.

The investigation led to the April 1, 1987 indictment of Stanley Simon, former Bronx Borough President, on six counts of extortion, obstruction of justice, perjury, and tax evasion. On June 3, 1987 a superseding indictment charged Simon and six additional defendants with violating the federal racketeering statute (RICO) based on their participation in bribery and other crimes committed in connection with Wedtech's activities. The six other defendants are Mario Biaggi, U.S. Congressman from the Bronx; his son, Richard Biaggi, a member of the Congressman's former law firm, Biaggi & Ehrlich; General Bernard Ehrlich, partner in that law firm; Peter Neglia, former New York Regional Director of the U.S. Small Business Administration; John Mariotta, cofounder of Wedtech, formerly its chief executive officer, chairman of its Board, and principal stockholder; and Ronald Betso, holder of an option to purchase 20,000 shares of Wedtech stock allegedly placed in Betso's name for defendant Neglia. Each defendant is accused of having benefitted financially from the criminal activities of Wedtech; Simon, Mario Biaggi, and Neglia are also charged with having misused their public offices on its behalf. All the defendants except Mario Biaggi and Betso are appellees on this appeal. In addition to state and federal investigations, two congressional committees are examining the affairs of individuals connected with Wedtech.

The record reflects a plethora of publicity concerning the Wedtech investigation since October 1986. From then until the April 1, 1987 indictment, articles appeared in all of the region's major newspapers detailing the joint federal-state investigation and the grand jury proceedings relating to Stanley Simon. Although the attribution to sources and the facts vary in their specificity, and perhaps accuracy, the net effect clearly translated secret grand jury proceedings into matters of public knowledge. In late May 1987, news articles again described in detail the targets, charges, negotiations, and timing of the superseding June 3 indictment. The news stories revealed what was being investigated, what the grand jury was hearing, what witnesses were being called or about to be called, and what they would say. This apparently accurate information was often ascribed to "law enforcement sources," "law enforcement officials," and "prosecutors."

In these and other flurries of publicity, the prosecutors, defendants, and defense counsel participated in the escalating publicity duels. As a result, on April 10, 1987 —nine days after the original indictment was filed against Stanley Simon—his defense counsel orally proposed in open court before Judge Cannella that the parties agree to a "gag" order restraining extrajudicial speech by all trial participants. Simon's counsel asserted that media publicity resulting from state and federal prosecutors' violation of grand jury secrecy required a blanket order to insure that his client received a fair trial. At first the government concurred orally in the proposed stipulated order, but later in a letter addressed to the court stated that the prosecution opposed extension of Rule 7 of the Criminal Rules of the Southern District of New York (Local Rule 7), which limits out-of-court statements by prosecutors and defense attorneys.

On April 23, 1987 the district court nonetheless entered a broad restraining order directed to the prosecutors, defendants, and defense counsel. The news agencies were not named in the April 23 order, which remained in effect—apart from a court-approved press conference held on June 3, 1987 to announce the six additional indictments—until entry of the July 10 order that is the subject of this appeal.

On June 12, 1987, at the news agencies' request, the district court heard oral arguments as to whether the broad April 23 order should be continued. Five defendants supported its continuance, two defendants (including Mario Biaggi) took no position, and the government and news agencies argued that it should be vacated. On July 10 the district court modified its April 23 order so that it provides

ORDERED, that the United States Attorney and the District Attorney for Bronx County, their representatives and agents,

defendants Stanley Simon, Mario Biaggi, John Mariotta, Peter Neglia, Bernard Ehrlich, Richard Biaggi and Ronald Betso, and their counsel and representatives SHALL NOT MAKE ANY extrajudicial statement concerning this case (1) to any person associated with a public communications media, or (2) that a reasonable person would expect to be communicated to a public communications media, except that nothing in this Order shall prohibit any individual from:

(A) Stating, without elaboration or characterization—

(1) the general nature of an allegation or defense;

(2) information contained in the public record;

(3) the scheduling or result of any step in the proceedings; or

(B) Explaining, without characterization, the contents or substance of any motion or step in the proceedings, to the extent such motion or step is a matter of public record.

This Order supersedes all previous orders.

As appears from its terms, this order does not impinge on the full reporting of courtroom and other public proceedings. It prohibits virtually all other extrajudicial speech relating to the pending Wedtech case. On July 27, 1987 Judge Motley—newly assigned to the expanded criminal matter as a result of the superseding indictments—denied the news agencies' motion that she reconsider and vacate Judge Cannella's July 10 order. The news agencies appeal from the July 10 gag order and from the July 27 order that denied the motion to vacate it. We expedited the appeal from these orders.

## DISCUSSION

### I *Standing*

The threshold question presented is whether the news agencies have standing to bring this appeal even though they are neither named in nor restrained by the order. In order for appellants to maintain their appeal the requirements of Article III

of the Constitution as well as judicially imposed prudential requirements must be satisfied, *see Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975); *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). Federal judicial power is limited to the adjudication of "legal rights of litigants in actual controversies." *Liverpool, N.Y. & Phil. S.S. Co. v. Commissioners of Emigration,* 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885). The defendants in the underlying criminal case contend that the news agencies—as non-parties to the criminal proceedings and as sole challengers to the July 10 restraining order—do not present a sufficiently concrete "case" or "controversy" to satisfy the standing requirements.

To have standing, a party must allege (1) a personal injury in fact, (2) a violation of his or her own, not a third-party's, rights, (3) that the injury falls within the zone of interests protected by the constitutional guarantee involved, (4) that the injury is traceable to the challenged act, and (5) that the courts can grant redress for the injury. *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472–74, 102 S.Ct. 752, 758–59, 70 L.Ed. 2d 700 (1982). Defendants argue that the news agencies fail to meet the first three requirements.

To satisfy the critical constitutional test of personal injury in fact, the Supreme Court instructs that the injury or threat of injury must be "distinct and palpable," *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206, and "concrete," *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 221, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974). The litigant must be "immediately in danger," *O'Shea v. Littleton,* 414 U.S. 488, 494 (1974) (quoting *Massachusetts v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923)), and the injury must be "direct," *Ex parte LeVitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937) (per curiam). Some injury in the future is not enough; the harm must be "real and immediate," not "conjectural" or hypothetical,

*Golden v. Zwickler*, 394 U.S. 103, 109, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969).

The news companies argue they have standing—satisfying all the above tests—because the "zone" of First Amendment protection extends to a "recipient's right" to hear speech from unrestrained prosecutors and defendants. Defendants respond to this argument by stating that the possibility that in the future hypothetical speakers may exist does not constitute injury in fact. They claim that not only does that proposition violate the constitutional requirement of injury in fact, but it runs afoul of the prudential rule that to have standing one must assert his or her own rights, not another's rights. Relying on *Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978), defendants conclude that because neither the government nor the defendants have appealed the restraining order, appellants' news agencies lack standing to do it for them.

Defendants' argument in theory has a patina of plausibility. But the rights of potential recipients of speech, like the news agencies, to challenge the abridgment of that speech has already been decided. The Supreme Court in *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), held that consumers of prescription drugs have standing to challenge state restrictions on drug price advertising by licensed retail pharmacists. The Court reasoned that "where a [willing] speaker exists, ... the protection afforded is to the communication, to its source and to its recipients both." *Id.* at 756, 96 S.Ct. at 1823. This "reciprocal right to receive" the protected speech—the commercial advertising—"may be asserted" by the recipients. *Id.* at 757, 96 S.Ct. at 1823. The corollary to the guarantee of free speech is that "there be full opportunity for everyone to receive the message." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 76, 96 S.Ct. 2440, 2455, 49 L.Ed.2d 310 (1976) (Powell, J. concurring).

First Amendment protection for recipients of speech extends to a wide variety of contexts. *Virginia State Bd.* at 756–57, 96 S.Ct. at 1823; *see Procunier v. Martinez*, 416 U.S. 396, 408–09, 94 S.Ct. 1800, 1808–09, 40 L.Ed.2d 224 (1974) (censorship of prison inmates' mail infringed the rights of noninmates to whom mail was addressed); *Kleindienst v. Mandel*, 408 U.S. 753, 762–65, 92 S.Ct. 2576, 2581–82, 33 L.Ed.2d 683 (1972) (American scholars have right to hear, speak, and debate alien Belgium Marxian theoretician with no personal entry right); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 386–90, 89 S.Ct. 1794, 1804–06, 23 L.Ed.2d 371 (1969) (public has right to receive suitable access to social, political, esthetic, moral and other ideas through broadcast media); *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969) (right to receive information and ideas extends to possession of obscene materials in one's own home); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (citizens have First Amendment right to receive communist political publications from abroad). Throughout all these cases the First Amendment unwaveringly protects the right to receive information and ideas. A challenge by news agencies must certainly be permitted when the restrained speech, as here, concerns allegations of corruption by public officials in obtaining federal contracts.

Whether the news agencies are actually potential receivers of otherwise restrained speech must then be considered. The record clearly supports the district court's conclusion that the news agencies are in fact potential recipients of speech by the prosecutors, defense counsel, and the defendants in the underlying Wedtech case. The district judge recognized that there had been extensive—pre-restraining order—extrajudicial statements by all these individuals. Plainly, a group of attorneys let loose to speak on Wedtech's activities would add to an already rampant flood of out-of-court publicity. It is hard, in fact, to imagine that there are no willing speakers. Without them there would be no need for a restraining order; it would be superfluous.

That the United States Attorney opposed the April 23 and July 10 orders—but de-

clined to join in this appeal—does not suggest that absent the restraining order the government also is not a willing speaker. Its position has been that as prosecutor it is bound by the existing federal rules and local rules of criminal procedure, by the Code of Professional Responsibility, and by internal Justice Department regulations. Within these limitations on what federal prosecutors may divulge, there is no indication that government prosecutors are not willing speakers. Additionally, whether or not defendants and their counsel desire media coverage, the record reveals that were they not restrained, such persons would also be willing speakers. These findings by the district court as to the willingness of the various individuals to speak are not clearly erroneous.

Hence, we hold that the news agencies have standing to appeal Judge Cannella's order restraining speech of the trial participants. Because we hold that the news agencies have standing as recipients of speech to prosecute this appeal, it is not necessary to address whether applicants' status as news gatherers also affords them standing.

## II  *Is the Order a Prior Restraint?*

■ The news agencies portray the July 10 order as a classic prior restraint on the press. We disagree. The trial participants' right to freedom of speech, as *Virginia State Board of Pharmacy* teaches, necessarily and logically protects the news agencies' right to receive that speech. *See* 425 U.S. at 757, 96 S.Ct. at 1823. It is that right to receive speech that affords standing to the press to maintain this action. But, when considering the merits, the press' right to receive speech does not enlarge the rights of those directly subject to the restraining order. Success on the merits for the news agencies is entirely derivative of the rights of the trial participants to speak. For this reason we undertake a careful evaluation of the July 10 order directed at trial participants, but challenged by the press.

To determine if the July 10 order is a prior restraint, we analyze its operation and effect in the particular circumstances of this case. *See Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 441–42, 77 S.Ct. 1325, 1327–28, 1 L.Ed.2d 1469 (1957) (a "pragmatic assessment" of a statute's operation in "particular circumstances" determines if it is a prior restraint). To begin, there is a substantial difference between a restraining order directed against the press—a form of censorship which the First Amendment sought to abolish from these shores—and the order here directed solely against trial participants and challenged only by the press. The distinction is critical.

The most offensive aspect of a prior restraint is the censorship involved by forbidding the dissemination of information already known to the press and therefore public. A prior restraint deprives the public of specific news because it prevents publication. Although the restraining order in this case limits the flow of information readily available to the news agencies—and for that reason might have an effect similar to that of a prior restraint—the fact that the order is not directed at the news agencies and that they therefore cannot be haled into court for violating its terms deflates what would otherwise be a serious concern regarding judicial censorship of the press. For this reason the order is considerably less intrusive of First Amendment rights than one directly aimed at the press.

The Ninth Circuit has drawn the distinction between restraining orders directed at trial participants challenged by the press and those challenged by trial participants. *Compare Radio & Television News Ass'n v. United States Dist. Court for the Cent. Dist.,* 781 F.2d 1443, 1446 (9th Cir.1986) (restraining order not directed at the press does not restrain press' First Amendment rights) *with Levine v. United States Dist. Court for the Cent. Dist.,* 764 F.2d 590, 595 (9th Cir.1985) ("the district court's order is properly characterized as a prior restraint" on counsel's First Amendment right to free speech), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2276, 90 L.Ed.2d 719 (1986). The Sixth Circuit takes a different view. In a civil suit arising from the aftermath of the Kent State shootings, a media company

challenged the restraining order directed only to parties, counsel, and their agents. *CBS v. Young*, 522 F.2d 234 (6th Cir.1975). In *Young*, the court held that "the conclusion is inevitable that [the restraining order] constitutes a prior direct restraint upon freedom of expression." *Id.* at 239. Adopting this view ignores the fact that the defendants here requested the order and urge its affirmance. Thus, we conclude that there is a fundamental difference between a gag order challenged by the individual gagged and one challenged by a third party; an order objected to by the former is properly characterized as a prior restraint, one opposed solely by the latter is not.

Here nothing prevented the restrained parties in the present litigation from challenging the July 10 order. Hence, despite their unquestioned standing to maintain this appeal, the news agencies may not assert defendants' First Amendment rights when defendants refuse to challenge that infringement themselves. *See Radio & Television News Ass'n*, 781 F.2d at 1448 ("The RTNA lacks standing to assert the free speech constitutional rights of the non-party trial counsel in challenging this order."). For the reasons stated the July 10 order may not therefore be characterized as a prior restraint on the news agencies as appellants.

### III  *Justification for the Order*

To conclude that this is not a case of prior restraint of the press is not to say that the restraining order need not be justified. On the contrary, it must be. The impact of the subject order implicates press freedom, even though it does so indirectly. There is tension between the media's First Amendment right to publish and an accused person's Sixth Amendment right to a fair trial before an impartial jury.

Each right is crucial to the maintenance of a free society. Without freedom of the press a free society will not long endure. A free press is particularly important when public officials face criminal charges relating to their use of office. Although often appearing unfair in the eyes of the public,

pretrial publicity, "even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976). It should not be overlooked that a jury need not consist of persons entirely ignorant of the case they are about to hear; all that the Constitution requires is a jury that is impartial, one that is capable of fairly deciding on the evidence before it whether defendants are innocent or guilty. *See Sheppard v. Maxwell*, 384 U.S. 333, 351, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966); *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).

■ At the same time the proper administration of criminal justice must protect an accused's Sixth Amendment rights. "[T]he theory of our system," as Justice Holmes explained 80 years ago, "is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907). Aware of this inherent tension between freedom of the press and the right to trial by an impartial jury, the framers of our Constitution did not assign priorities between them. *See Nebraska Press*, 427 U.S. at 547, 561, 96 S.Ct. at 2803. When the exercise of free press rights actually tramples upon Sixth Amendment rights, the former must nonetheless yield to the latter. *See Pennekamp v. Florida*, 328 U.S. 331, 347, 66 S.Ct. 1029, 1037, 90 L.Ed. 1295 (1946) ("Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice.").

To adjust the conflict between competing constitutional values, prophylactic measures are preferred over remedial ones. *See Nebraska Press*, 427 U.S. at 555, 96 S.Ct. at 2801 (relying on reversals for failure to afford a fair trial can exact high costs on society and the accused, including justice delayed, impossible retrials, and injustice unredressed). The preventive task is complex because it involves determining

whether there exists a sufficient threat to an impartial trial to justify a restraint on speech.

## A. The Legal Standard

■ To decide whether the pretrial publicity justified the order, the standard by which to measure justification is whether there is a "reasonable likelihood" that pretrial publicity will prejudice a fair trial. *See Sheppard v. Maxwell,* 384 U.S. at 363, 86 S.Ct. at 1522. The Local Criminal Rules for the Southern District of New York concerning extrajudicial speech also adopt a "reasonable likelihood" standard. As a direct result of the "Free Press—Fair Trial Report" of 1968, *reprinted in* 45 F.R.D. 391, 404 (1968), Local Rule 7(a) prohibits counsel from releasing any information "if there is a reasonable likelihood that such dissemination will interfere with a fair trial...." S.D.N.Y.Crim.R. 7(a). The nature and extent of the pretrial news coverage in this case must be examined to see if the pretrial publicity in the light of that standard posed such a threat to defendants' Sixth Amendment rights as to justify the July 10 restraining order.

## B. The Standard Applied

■ As noted, Wedtech's affairs and the activities of those associated with it have generated state, federal, and congressional investigations encompassing local, state, and federal officials including, among others, the Attorney General of the United States. When Simon's defense counsel requested a broad restraining order on April 17, 1987 he detailed what he considered serious violations of grand jury secrecy rules that had occurred from the beginning of the investigation of Stanley Simon until the announcement of his indictment on April 1. Defense counsel believed that prosecutors had violated the grand jury secrecy provisions of Fed.R.Crim.P. 6(e), and in his affidavit he charged that the Southern District United States Attorney and the Bronx County District Attorney revealed prejudicial material at the press conference announcing Simon's indictment. He asked the district court to protect against further abuse of the judicial pro-

cess until the defense could present a motion addressed to the government's violation of Rule 6(e). It was on this basis that Judge Cannella issued the restraining order of April 23, 1987.

Subsequently, on May 28, 1987 defense counsel made a motion for an evidentiary hearing and sanctions pursuant to Fed.R. Crim.P. 42(b) (criminal contempt) and 18 U.S.C. § 401(3)(1982) (power of courts to punish contempt) for government violations of the April 23 order. The accompanying affidavit asserted that news articles, attributed to government sources, "identify the people who will be included in superseding indictments in this case, speak of the content of the indictments that will be handed down and detail negotiations between attorneys for the government and those who will be indicted."

At the same time that defense counsel moved for contempt proceedings, the United States Attorney requested and was granted modification of the April 23 restraining order in order to announce the subsequent indictments of the other six defendants. About a week later Judge Cannella stated that the April 23 order applied in full to all trial participants and their counsel including those named in the superseding indictment of June 3. On June 8 the news media challenged the restraining order as an unconstitutional prior restraint. On June 12 the district court held a hearing to consider extending or modifying the April 23 order, at which the government asserted that it was not in contempt of the April 23 order—as alleged by defense counsel on May 23—and that federal prosecutors had not violated either Federal Rule 6(e) or Local Rule 7. The district court deferred ruling on the defense contempt motion until the conclusion of the trial.

The district court found that extensive publicity had predated Stanley Simon's April indictment. After the indictment, there was massive publicity concerning the targets of the ongoing grand jury investigation, accompanied by what the district court described as a "shameful abuse of

grand jury secrecy." This abuse included leaking to the media the identities and testimony of grand jury witnesses. Despite the district court's restraining order of April 23, this sort of publicity and the grand jury "leaks" continued up until the return of the superseding indictment on June 3.

Obviously, this case is not an isolated instance of prejudicial pretrial publicity. An Ad Hoc Committee of the Association of the Bar of the City of New York has found an upsurge in the use of media by lawyers in connection with pending investigations and indictments, noting that prosecutors appear on television announcing and discussing indictments, and attorneys for the accused wage contests in the press. *Report of the Ad Hoc Committee on Pretrial Publicity 3* (Ass'n of the Bar of the City of New York, 1987) (*Ad Hoc Committee Report*). Yet Ethical Consideration 7–25 of New York's Code of Professional Responsibility states that "a lawyer should not make any prefatory statement before a tribunal in regard to the purported facts of the case on trial unless he believes that his statement will be supported by admissible evidence; a lawyer should not ask a witness a question solely for the purpose of harassing or embarrassing him; and a lawyer should not by subterfuge put before a jury matters which it cannot properly consider." N.Y.Jud.Law EC 7–25 (McKinney 1975). The Ad Hoc Committee on Pretrial Publicity was concerned with lawyers outside the courtroom deliberately embarrassing other persons when ethical constraints admonish against doing so within. *Ad Hoc Committee Report* at 6. It was further concerned by lawyers airing matters in the press that are inadmissible at trial. *Id.*

Several policy concerns militate strongly in favor of maintaining the secrecy of grand jury proceedings. Otherwise, targets learning of their possible indictment might flee or tamper with grand jury witnesses. Witnesses would be less willing to appear and testify for fear of reprisal. Not the least important consideration is to protect the good name and reputation of those investigated, but not indicted, by the grand jury. *See Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 219, 99 S.Ct. 1667, 1672, 60 L.Ed.2d 156 (1979).

Based upon the sensational public nature of the case and the leaks of grand jury information, the district court found that failure to restrain the trial participants would add "fuel to an already voracious fire of publicity" and create "a real and substantial likelihood that some, if not all, defendants might be deprived of a fair trial." We are unable to say upon reviewing this record that the findings relied upon by the district court to support that conclusion are clearly erroneous. Consequently, the district court was justified in considering the imposition of a "gag" order on trial participants.

### IV Consideration of Less Restrictive Alternatives

As the district judge properly recognized, before entering an injunction against speech he had to explore whether other available remedies would effectively mitigate the prejudicial publicity. *See Nebraska Press,* 427 U.S. at 562, 96 S.Ct. at 2804. The mitigating measures, derived from the Supreme Court's discussion in *Sheppard v. Maxwell,* 384 U.S. at 358–63, 86 S.Ct. at 1519–22, include change of venue, trial postponement, a searching voir dire, emphatic jury instructions, and sequestration of jurors. *See Nebraska Press,* 427 U.S. at 563–64, 96 S.Ct. at 2804–05. These precautions are like words to a writer, *see* L. Wittgenstein, *Philosophical Investigations* ¶¶ 11–14 (G.E.M. Anscombe trans. 3d ed. 1958). Each is a different tool which, depending on the context in which it is used, provides a different effect. The precautions share one thing in common: each must be explored and ultimately rejected as inadequate—individually and in combination—as a remedy for prejudicial pretrial publicity before a restraining order is entered. Some combination of preventive measures short of a restraining order usually achieves this goal.[1]

---

1. In addition to considering the amount of pre-

trial publicity and the availability of alternative

But in this case the district court carefully considered and found the use of these other measures unable to stop the grand jury leaks and the publicity prejudicial to defendants' rights that came from it. We concur in the district court's perceptions and its prediction that the only effective recourse available was the use of a restraining order.

## CONCLUSION

While the right of the press to publish should be compromised as little as possible, "trial by newspapers," as Justice Frankfurter observed, too often differs from the real trial in court and it is the defendant who suffers the "distorted consequences." *Pennekamp v. Florida,* 328 U.S. at 361, 363, 66 S.Ct. at 1045 (Frankfurter, J. concurring). The problem begins not with the publishing of news by a free press, but with a hemorrhage of small leaks of secret grand jury information released to the media. This leads directly to prosecutor and defense counsel inciting trial by the press. It is altogether fitting that the solution should restrict those at the source of the problem: counsel who serve as officers of the court, a body which has a duty to insure that the accused receives an impartial trial. A focus on the source of potentially prejudicial statements rather than the publisher of such statements has been endorsed by the courts and also by committees that addressed specifically the fair trial-free press issue. *See Ad Hoc Committee Report* at 7–14 (recommending amendments to the New York Code of Professional Responsibility to curb potential extrajudicial speech abuses).

Accordingly, for the reasons stated the order appealed from is affirmed.