**UNITED STATES of America**

v.

**Len E. DAVIS, et al.**

**Crim. A. No. 94–368.**

United States District Court, E.D. Louisiana.

Oct. 12, 1995.

John Harvey Craft, Federal Public Defender, New Orleans, LA, Curklin Atkins, Curklin Atkins, PLC, New Orleans, LA, for Len E. Davis.

Lawrence Blake Jones, Scheuermann & Jones, New Orleans, LA, John T. Mulvehill, Federal Public Defender, New Orleans, LA, for Sammie L. Williams, Jr.

Provino C. Mosca, Provino C. Mosca, Attorney at Law, New Orleans, LA, for Larry Smith, Jr.

Endesha Juakali, New Orleans, LA, John T. Mulvehill, Federal Public Defender, New Orleans, LA, Richard Bert Stricks, Richard B. Stricks, New Orleans, LA, for Bryant K. Brown.

Robert S. Glass, Glass & Reed, New Orleans, LA, for Adam Euree Dees.

Ernest Lake Jones, Elie, Jones & Gray, New Orleans, LA, for Carlos–Rodriguez.

Milton Paul Masinter, Milton P. Masinter, Metairie, LA, Thomas More Calogero, Regan, Manasseh & Boshea, New Orleans, LA, Charles L. Elloie, Elloie & Associates, New Orleans, LA, for Keith Johnson.

John Wilson Reed, Glass & Reed, New Orleans, LA, for Christopher K. Evans.

Steven Lemoine, New Orleans, LA, Benny S. George, Jr., Benny S. George Jr., New Orleans, LA, for Sheldon Polk.

Clarence Roby, Jr., Clarence Roby, Jr., PLC, New Orleans, LA, for Edward Williams.

Jack M. Weiss, Mark Benjamin Holton, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, LA, for Times Picayune, Michael Perlstein.

## ORDER AND REASONS

FELDMAN, District Judge.

Before the Court are two motions filed by the Times–Picayune Publishing Company and the newspaper's reporter, Michael Perlstein:[1] a motion to intervene, and a motion to vacate the Court's Order of December 16, 1994, prohibiting the participants in this case from making certain specific extrajudicial statements. For the following reasons, the *Picayune's* motion to intervene is GRANTED, and the motion to vacate the Order is DENIED.

### Background

On December 7, 1994, the United States indicted Len Davis and eight other officers of the New Orleans Police Department for various drug conspiracy and weapons violations. The indictments were based, in part, on video and audio tape recordings made by the FBI during a year-long undercover investigation. In addition, in a separate indictment, the government charged Officer Davis with ordering the execution of Ms. Kim Groves, allegedly as retaliation for her filing of a civil rights complaint against Officer Davis. That case is currently pending in another section of this Court, and is set for trial on January 22, 1996. It is unrelated to the drug conspiracy case, except that it came to light during electronic monitoring of the alleged conspiracy.

On December 16, 1994, this Court, with the consent of all counsel and the FBI, entered the following Order:

> The Court renders this Order to insure that all parties will have a fair and impartial trial in this case.
>
> IT IS ORDERED:
>
> That the United States Attorney, his representatives and agents, the Federal Bureau of Investigation, its representatives and agents, the defendants, Len E. Davis, Sammie L. Williams, Jr., Larry Smith, Jr., Bryant K. Brown, a/k/a "Brinkey," Adam Euree Dees, Carlos Rodriguez, Keith Johnson, Christopher K. Evans and Sheldon Polk, and their counsel, representatives and agents, shall not make any extrajudicial statements concerning this case to any person or persons associated with any public communications media or that a reasonable person would expect to be communicated to a public communi-

---

1. The Court will refer to both movants collectively as the *Times–Picayune,* the *Picayune,* or the newspaper.

cations media, except, however, that nothing herein shall prohibit any individual from the following:

1. Stating, without elaboration or any kind of characterization whatsoever,

    a. the general nature of an allegation or defense made in this case;

    b. information contained in the public record of this case; or,

    c. the scheduling or result of any step or decision taken in the proceedings of this case.

2. Explaining, without any elaboration or any kind of characterization whatsoever, the contents or substance of any motion or step in the proceedings, to the extent such motion or step is a matter of public record in this case.

*Order,* Dec. 16, 1994. None of the parties subject to the Order objected to the restrictions, either at the time of entry or at any time thereafter.

### Law and Application

#### I. *Motion to Intervene*

The *Picayune* asserts that intervention under Rule 24 is the appropriate mechanism to challenge the Court's Order. However, it is noteworthy that both cases invoked in support of intervention involved civil, rather than criminal, proceedings. The Federal Rules of Criminal Procedure contain no mirror intervention provision. *See In re Application of the New York Times Co.,* 878 F.2d 67, 67–68 (2d Cir.1989) (noting that "no rule of criminal procedure allows intervention by third parties in a criminal proceeding," but finding that Court of Appeals has jurisdiction over the newspapers' appeal of gag order); *see also In re Application of National Broadcasting Co.,* 635 F.2d 945, 949 n. 2 (2d Cir.1980) (holding that although "dispute could have been treated by the District Court as a new civil case" rather than as a proceeding within the criminal case, "[n]o jurisdictional significance should attach to the fact" that it was not).

In criminal cases, most newspapers have challenged gag orders by seeking mandamus against the court or the judge. *E.g., News–Journal Corp. v. Foxman,* 939 F.2d 1499

(11th Cir.1991); *Radio & Television News Ass'n of Southern Calif. v. United States District Court,* 781 F.2d 1443 (9th Cir.1985). The Ninth and Fourth Circuits have expressly approved the mandamus procedure. *Radio & Television News Ass'n,* 781 F.2d at 1445; *Central South Carolina Chapter, Society of Professional Journalists v. Martin,* 556 F.2d 706, 707 (4th Cir.1977). Without referring specifically to any procedure, the Second Circuit has held that a newspaper has standing to appeal entry of a gag order. *New York Times Co.,* 878 F.2d at 67–68. The Court can find no reported cases either upholding or denying intervention under these circumstances.

■ Although the issue remains unsettled, its determination here has little significance. The *Picayune* clearly has standing to question the Court's order. Whether the newspaper voices its objections by filing a separate miscellaneous action, a motion for intervention, a writ of mandamus, or an interlocutory appeal merely elevates form over substance. The Court permits this intervention and the motion to intervene is GRANTED.

#### II. *Motion to Vacate the Order*

##### A. Standing

■ Even though they are not parties in the case, the *Times–Picayune* and its reporter have standing to try to lift the Court's Order. Standing requires that one suffer injury-in-fact that is causally connected to the challenged action.

Courts have universally held that restrictions placed on willing speakers implicate the First Amendment rights of their audience. Thus, as part of that audience, the newspaper does not assert third-party standing here: it bases its claims on direct injury to its own First Amendment rights, rather than on any constitutional harm suffered by others. *See In re Application of Dow Jones & Co.,* 842 F.2d 603, 606–07 (2d Cir.1988); *Radio & Television News Ass'n,* 781 F.2d at 1445–46; *CBS Inc. v. Young,* 522 F.2d 234, 237–38 (6th Cir.1985); *see also Central South Carolina Chapter, Society of Professional Journalists v. Martin,* 431 F.Supp. 1182, 1186–88 (D.S.C.1977) (finding press has no

standing to challenge order), *rev'd,* 556 F.2d 706 (4th Cir.1977). This Court's Order was crafted on the model of *Dow Jones.*

### B. Merits

#### 1. *Standard of Review*

■ In the context of criminal proceedings, a tension exists between a defendant's Sixth Amendment right to a fair trial and the First Amendment rights of free speech and access of the press, the public, and trial participants. The recent O.J. Simpson murder trial in Los Angeles has patently worsened that tension. The United States Supreme Court long ago held that the Sixth Amendment imposes an affirmative duty on the trial court to limit prejudicial publicity. *Sheppard v. Maxwell,* 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522–23, 16 L.Ed.2d 600 (1966). But in another set of decisions, the Court has shown disfavor toward prior restraints on speech. *See Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). The term "prior restraint" usually refers to a "predetermined judicial prohibition restraining specific expression" with violation punishable by contempt. *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 248 (7th Cir.1975). Therefore, the first question this motion asks is whether the December 16 Order is a prior restraint on speech that is subject to strict constitutional scrutiny.

No certain consensus exists as to whether an order that regulates the trial participants' extrajudicial statements is a prior restraint. *Compare Dow Jones & Co.,* 842 F.2d at 608–09 (finding no prior restraint); *Radio & Television News Ass'n,* 781 F.2d at 1446–47 (same); *Central South Carolina Chapter, Society of Professional Journalists,* 431 F.Supp. at 1188–89 (same) *with United States v. Salameh,* 992 F.2d 445, 446–47 (2d Cir.1993) (finding prior restraint); *CBS Inc. v. Young,* 522 F.2d 234 at 239 (6th Cir.1975) (same); *Chicago Council of Lawyers,* 522 F.2d at 248–49 (finding that rules limiting extrajudicial statements contained some features of prior restraint); *Chase v. Robson,* 435 F.2d 1059, 1061 (7th Cir.1970) (finding prior restraint).

■ One consistent theme does, however, emerge from the case literature: a real difference exists between restraints imposed on trial participants and those that directly obstruct publication or dissemination. *Dow Jones & Co.,* 842 F.2d at 608. Because the newspapers themselves cannot be "haled into court for violating its terms," an order aimed at trial participants is "considerably less intrusive of First Amendment rights." *Id.; see also Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1074, 111 S.Ct. 2720, 2744, 115 L.Ed.2d 888 (1991) ("[T]he speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press . . . .").

■ And so the identity of the challenger has significance. *Compare Dow Jones & Co.,* 842 F.2d at 612 (upholding order challenged by members of the press) *with Salameh,* 992 F.2d at 447 (striking down order challenged by defense counsel). The characterization of a gag order as a disfavored prior restraint that is subject to a presumption against constitutionality depends greatly upon who protests its imposition. Although a gag order may run—as in both *Dow Jones & Co.* and *Salameh*—only against the trial participants, it is held to a higher standard if a trial participant, rather than the press, contests it. The distinction has been acknowledged in the Ninth Circuit also. *Compare Levine v. United States District Court,* 764 F.2d 590 (9th Cir.1985) (finding gag order a prior restraint on participants' speech) *with Radio & Television News Ass'n,* 781 F.2d at 1447 (finding that gag order running against trial participants does not constitute prior restraint against the press).

■ The Court finds this approach persuasive. The First Amendment interests of trial participants in their own speech are simply not doctrinally coextensive with the interests of news agencies in that speech. Thus, the Court must look at the publicity surrounding this case and the restrictions contained in its December 16 Order, and be mindful that the *Times–Picayune* (and its reporter), alone, challenges the Order.

### 2. Pre-trial Publicity

#### A.

This now-notorious case, involving drug conspiracy and weapons charges against nine members of the New Orleans Police Department, has incited intense public comment. The indictment, along with other allegations of criminal conduct and corruption in the NOPD, has provoked editorials and stories in the national and local press, two segments on the "Sixty Minutes" CBS television program, sparked a persistent outcry locally for police reform, and has resulted in part in the replacement of the City's police commissioner. In a year of extensive national accusations of police and law enforcement abuses, this case has continually been invoked as a reference point in the public discourse. The Times–Picayune, without subtlety, ignores this environment.

During the first week after return of the indictment, local and national television stations prominently featured the arrests of the defendants. They showed footage from the video tapes and audio recordings made during the government's investigation, and, as did the newspapers, described in detail excerpts from these transcripts. The media referred to Officer Davis as the "Desire [Housing Project] Terror" and various other unflattering nicknames. A December 11, 1994 editorial in the Times–Picayune, announced, among other things, that "Crooked Cops [Were] Killing Public Trust." Unquestionably, the identities and occupation of the defendants and the nature of the charges against them resulted in expressions of deep outrage and fear in this community. The Davis murder case has sparked similar attention. This Court has been concerned enough, about a fair trial, to do preliminary screening of potential juror-bias by way of a written questionnaire to two hundred fifty people in this district.

#### B.

The Times–Picayune's motion makes no mention of this background. Neither, however, does it contest that considerable publicity attended this case from the beginning. To the contrary, the fact of the newspaper's motion itself admits that this case carries substantial importance in the public mind. The Court draws attention to the fact that the case has been mentioned in over forty-three local and national news items since December 16, despite limited comments from the trial participants. Compared to the sixteen focused newspaper reports that appeared during the week between the indictment and the entry of the Order, however, this number is a mere trickle.

It is on that public stage that the Court concludes that its Order was, and remains, necessary to prevent a frenzy of publicity, and to ensure the defendants' rights to an impartial jury and a fair trial. Its effectiveness has been strengthened by the willing cooperation of the trial participants themselves; the Court has had cause to issue only a few warnings to counsel in the case about their interactions with the media. Without Court-ordered limitations, however, the quantity and—more importantly—the kind of risky attention that appeared immediately following the indictment could have continued unabated. Undeniably, unstructured and unregulated pre-trial publicity in this case carries—then and now—a substantial likelihood of materially prejudicing all common sense notions of fair trial. See Gentile, 501 U.S. at 1075, 111 S.Ct. at 2744 (finding that states may constitutionally prohibit statements of lawyers that carry a "substantial likelihood" of material prejudice). We experience today much national uncertainty in the public mind about the integrity of law enforcement agencies; the FBI, DEA, ATF, the Justice Department itself, and police departments from Philadelphia to Los Angeles to New Orleans have been the subject of widespread social and political scrutiny. The Court will not and, constitutionally, cannot allow the trial of this emotion-charged case to occur outside the courtroom. The Order of December 16 must continue in force.

Accordingly,

■ The motion of the Times–Picayune Publishing Company and the reporter, Michael Perlstein, to vacate the order is DENIED.