Clifford Eugene DAVIS, Jr., et al.
and United States of America

v.

**EAST BATON ROUGE PARISH SCHOOL BOARD, et al.**

Civil Action No. 56–1662–A.

United States District Court,
M.D. Louisiana.

Feb. 26, 1996.

---

Robert C. Williams, Baton Rouge, Louisiana, for Plaintiffs.

Franz Marshall, Department of Justice, Civil Rights Division, Washington, DC, L.J. Hymel, United States Attorney, M.D.LA, Brian Jackson, Assistant U.S. Attorney, Baton Rouge, Louisiana, for the United States.

Charles S. Patin, Jr., William R. D'Armond, Gregg R. Kronenberger, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, L.L.P., Baton Rouge, Louisiana, for East Baton Rouge Parish School Board.

Jack M. Weiss, III, Mark B. Holton, Stone, Pigman, Walther, Wittman & Hutchinson, New Orleans, Louisiana, for Capital City Press.

## SUPPLEMENTAL REASONS

JOHN V. PARKER, Chief Judge.

On February 22, 1996, the court held a hearing on the motions by the Capital City Press, Bill Pack and the Louisiana Television Broadcasting Corporation d/b/a WBRZ–TV (intervenors), to intervene and to "vacate gag order." For reasons orally given, the court granted the motion to intervene and denied the motion to "vacate the gag order." While it is sufficient for reasons to be orally stated, the court finds that further explanation regarding reasons for denial of the motion to vacate is appropriate.[1]

Prior to 1954, the East Baton Rouge Parish School Board operated separate schools for white and black children by force of law. This school desegregation case was filed in 1956 following the landmark decisions in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). The history of this litigation has been well documented in several legal decisions, including *Davis v. East Baton Rouge Parish School Bd.,* 721 F.2d 1425 (5th Cir.1983). For present purposes, it suffices to say that the School Board has had a continuing duty under the well settled jurisprudence to eradicate the vestiges of the dual school system. *Id.*

As the court attempted to explain at the February 22 hearing, the present members of the School Board have expressed a sincere interest in attempting to develop a proposed plan to submit to the court that might finally result in a just conclusion to this case. This is a vitally important matter to the entire community affecting not only the education of the children in this Parish but impacting on race relations generally. The history of this litigation has shown that this is the first time in forty years that a majority of the members of the school board have recognized and accepted their own personal responsibility to eradicate the vestiges of the dual system maintained by their predecessors.[2]

As the record will reflect, in 1980 this court again found that the East Baton Rouge Parish School Board was operating a dual system of public education based on race, (see 489 F.Supp. 498) and in 1981, by reason of the default of the Board, the court began issuing a series of orders intended to cause

---

1. The court's comments in denying the motion to vacate were couched in layman's language and constituted an attempt to reach out to the community in explanation of the historical and constitutional underpinnings for the requirement to desegregate the public schools generally and in this case. The court's aim was to further community acceptance of the notion of equal justice under law, both in theory and specifically in this community of about 400,000 people here and now, and thus obtain, in some degree, if not support for the efforts of the new East Baton Rouge Parish School Board to shoulder its own burden of desegregating the public schools (for the first time ever), at least a modicum of under-

standing or public tolerance of their effort. A transcript of the hearing (Attachment A) is attached and fully adopted here.

These supplemental reasons will all be "law talk." ■

2. Technically, a prior School Board did adopt a resolution declaring that it recognized its duties under the Constitution, but, as all counsel will agree, it did not do anything in furtherance of those responsibilities.

desegregation of the public schools (see 514 F.Supp. 869) all rulings were appealed and affirmed by the Court of Appeals. The 1980s, as the record will reflect, saw a series of confrontations between court and Board. Ultimately, the Board and staff adopted an attitude of reluctant compliance with the specific letter of court orders but nothing more.

In recent years the court, counsel for the United States and counsel for plaintiffs-intervenors have carefully monitored the Board's Singleton reports. Numerous status conferences have been held during which counsel for the United States and counsel for plaintiffs-intervenors have pointed out to counsel for the School Board (and other Board representatives) that the reports establish that despite the many orders of the court over the last 15 years, the public schools in East Baton Rouge Parish are still not in compliance with the Constitution. Counsel for the Board has not seriously disputed that position. Counsel for the United States has made plain that further efforts by the Board are required and has indicated that formal pleadings to that end will be forthcoming in the absence of action by the Board.

A little more than a year ago, a new School Board was elected and took office. The court has held status conferences with counsel and on one occasion with all the members of the new Board (there has been one change in the membership since.)

Based on representations made, this court is convinced that for the first time in the forty year history of this litigation, the new School Board acknowledges that it, not the court or any other entity, is charged with responsibility for desegregating the public schools and that it intends to implement that responsibility.

To that end, the Board has engaged a new superintendent and has publicly announced its intention to fashion a desegregation plan. It has begun to move forward.

The new Board now recognizes, as it perhaps did not at first, that there are adverse parties to the litigation who will have a say about whatever plan is fashioned and now are aware that if a consent decree is to be hammered out, the Board must consult with and discuss proposals with the adversary parties. Hence the occasion for the order about which objection is now made. The School Board seeks the opportunity to discuss privately among themselves, with their attorneys and such members of their staff as may be required, all matters relating to a possible plan of desegregation, the opportunity to privately discuss and plan strategy to be used in closed door negotiations with their adversary parties and to privately discuss reactions to those closed door negotiations. In addition, the Board wants to maintain the confidentiality of all such information during the preparation for and negotiations for such a plan and to require that the Board, attorneys and such Board staff as may become privy to such information, keep such information in confidence during these extremely delicate and sensitive activities.

Against this backdrop, on February 6, 1996, the court entered an order at the suggestion of the School Board prohibiting "its members, officers, employees, staff, agents, attorneys and all others acting ... on behalf of the ... Board" from "making any written or oral comments to any person or entity other than representatives and attorneys for litigants ... concerning any aspects of any drafts of desegregation plans ..."[3] While no written or oral reasons were given at that time, the parties were intimately familiar with the history of this case and there was no doubt that the order was requested to facilitate the efforts of the School Board in its attempt to expeditiously arrive at a proposal to submit to the court which satisfies the mandate of the Constitution and represents a local community resolution as opposed to a decree imposed upon the community by a "foreign" federal court.

Unfortunately, the order fails to make certain aspects crystal-clear. First and perhaps

---

**3.** The litigants were expressly authorized by the terms of the order to "fully discuss all matters among themselves" and the Board was allowed to disseminate "any final proposed plan" prior to filing it with the court. The order by its terms did not prevent the parties from stating that "an Order of this Court prohibits them from making any written or oral comments concerning any aspects of any drafts of desegregation plans."

foremost, the order has been incorrectly interpreted by the intervenors and others as allowing the School Board to promulgate a final desegregation plan which is set in stone and will be summarily approved by the court. Far from it, the order is intended to allow the school board to develop a proposal (regrettably referred to in the order as a "final proposed desegregation plan") to be submitted to the court. Public hearings will be conducted by the Board and by the court before and after the submission of the proposal.

Counsel for intervenors has repeatedly argued that the order allows the School Board to unveil its "final plan" thereby depriving the citizens of this Parish of their First Amendment rights to influence the contents of the "plan." See, e.g., Reply brief of Intervenors filed February 21, 1996, p. 10. Counsel for intervenors again focuses on false issues by citing *Pansy v. Borough of Stroudsburg,* 23 F.3d 772 (3rd Cir.1994). In *Pansy,* newspapers intervened to gain access to a settlement agreement of an individual's civil rights action.

This case is readily distinguishable from *Pansy* (and all the authorities submitted by counsel for intervenors) inasmuch as the court is not precluding disclosure of any settlement agreement. To the contrary, the court has expressly authorized any tentative plan or proposal that is reached to be fully disseminated to the public. The court has merely afforded the School Board an opportunity to negotiate in private—a chance for discussion unimpeded by outside sources. Moreover, the product of their negotiations will be a proposed desegregation plan of the School Board (not a settlement agreement between the parties) that must be approved by the court prior to implementation. It will of necessity become a matter of public judicial record, unlike the settlement agreement in *Pansy.* Moreover, it will, for the first time in forty years be a plan fashioned by the local Board itself—not an order imposed by a federal court.

Even after the intended purpose of the order has been made plain to intervenors by

the court and counsel for the School Board, intervenors conveniently overlook the history of this litigation and the obvious difficulties faced by the School Board in arriving at a proposal to submit to the court. Intervenors continue to emphasize the secrecy of the negotiations and the "draconian" effect of the order, rather than placing this matter in proper perspective. Intervenors attempt to obscure the fact that this is a kind of confidentiality order requested by one of the parties and its attorneys to facilitate it in deriving at a tentative proposal to submit to the court, a preliminary step that has yet to be made in the history of this litigation. It is clear that intervenors, while purporting to champion the rights of the public, have done nothing but impede the progress of the School Board in making this first important step.

In attempting to distract the attention of the court (and presumably the public) counsel for intervenors is long on cliche, catch phrase and colorful quote, but woefully short on actual constitutional support for the arguments tendered. As will be set forth in detail, the confidentiality order issued in this case is neither unprecedented, "draconian" nor an impingement upon the First Amendment rights of intervenors, contrary to counsel's argument.

Indeed, as we shall see, counsel for intervenors has produced no applicable legal authority in support [4] of his contentions, which, in this court's view amounts to an attempt to stand the First Amendment upon its head.

The court has carefully considered this matter and reiterates its conclusion that the motion to vacate the "gag order" lacks merit. The procedural objections of intervenors are that the order: (i) was entered without a formal motion being filed in the record; (ii) without affording the press or other persons an opportunity to be heard prior to its entry; and (iii) without supporting findings. However, at the time the order was entered, the press was not a party to this action and it accordingly had no right to be heard on this issue. The order was fully discussed with

---

**4.** Regrettably, counsel has failed to disclose to the court authority of which he was fully aware

which is directly contrary to the arguments advanced.

the parties and it was entered without objection. The court failed to provide reasons as this was unnecessary in view of the fact that the parties fully understood the circumstances and reasons for the order. The court notes that this is the same technical argument summarily rejected by the Eastern District a few weeks ago, presented by the same counsel on behalf of another client. See *United States v. Davis*, 904 F.Supp. 564, 566 (E.D.La.1995). The court also notes that counsel admittedly was fully aware of this authority specifically rejecting the same argument but failed to disclose it to the court.

The substantive grounds asserted by intervenors deserve serious consideration. The court is well aware of the importance of First Amendment rights. As the court observed at the hearing, there is no doubt that the news media has been effectively precluded from gathering news relative to the Board's progress. Accordingly, the court has found that the news media has sufficient interest to intervene and that it has standing to bring the motion to vacate. See, *Application of Dow Jones & Co. Inc.*, 842 F.2d 603 (2nd Cir.1988); *U.S. v. Davis*, 902 F.Supp. 98 (E.D.La.1995). To establish standing, it is not necessary that the news media establish that it will prevail on the merits. *Pansy*, supra, at p. 777.

■ Turning to the merits, the first thing that stands out is that the news media is attempting to assert the First Amendment rights of others[5] directly affected by the order. The parties have stipulated to testimony from which the court might arguably infer that there is a "willing speaker" essentially because the flow of information has stopped. The court does not find that such an inference is warranted in view of the totality of the circumstances. None of the parties has objected to the order; no one else has come forth to assert their First Amendment rights. The School Board is represented by newly retained counsel who has taken a different approach on these matters from years past and the Board is apparently willing to stand by the advice it has received. While it might be questioned why the order is necessary if no one wishes to talk, the School Board persuasively argues that the order allows the Board members to get on with the business at hand rather than having to constantly explain that they are acting on advice of counsel and the nature of that advice.

While intervenors have standing to raise this issue, intervenors may not assert the First Amendment rights of others who have declined to do so themselves. The news media obviously has no right to force others to talk. It is well established that the First Amendment does not provide the news media a constitutional right of special access to information not available to the public generally. *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). As Judge Berrigan aptly states in *Davis*, supra:

> "The First Amendment broadly protects a newspaper's right to print information it receives and certainly guarantees access to court proceedings. It does not, however, provide a carte blanche to obtain material from whatever source it may choose to contact". 904 F.Supp. at 566.

■ Yet, intervenors argue that this court's order constitutes a "prior restraint" subject to close judicial scrutiny. Generally, "prior restraints" restrict the flow of specific information already known to the news media. As discussed by the Second Circuit in the *Dow Jones* case, supra, there is a critical distinction between a restraining order directed against the press and one directed at trial participants or their attorneys. When the individual "gagged" objects to the order

---

5. Counsel asserts that the court's "draconian" order applies to "more than 7000 employees of the School Board "many of whom may well desire to speak to the media." The court expresses grave doubt that very many of the 7000 employees actually have any information about the Board's plans and discussions. Upon reflection, however, the order does appear to be inartfully drawn. The order is only intended to reach such School Board staff as have actual knowledge of and participation in the Board's present efforts. Counsel for the Board is hereby directed to prepare and submit for signature an appropriate amendment. The court also observes that none of the alleged 7000 "gagged" school staffers has attempted to intervene herein so as to be relieved of the "gag."

it should be considered a "prior restraint" but when the order is opposed solely by a third party is not properly characterized as a "prior restraint". *Dow Jones,* supra.[6]

Intervenors cite several other cases, which the court finds are distinguishable.[7] In distinguishing *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d

888 (1991) and *U.S. v. Salameh,* 992 F.2d 445 (2nd Cir.1993), Judge Berrigan observes that the protests came from "the parties whose speech was curtailed, not from a third party desirous to hear what they might have to say ..." 904 F.Supp. at p. 568. As in Judge Berrigan's case, the news media is asserting an "amorphous 'hope to hear' what someone may or may not choose to say" right.

---

**6.** The court recognizes that the Sixth Circuit has taken a contrary view in *CBS, Inc. v. Young,* 522 F.2d 234 (6th Cir.1975), a civil action arising from the confrontation at Kent State University between students and the Ohio National Guard. Students protesting the invasion of Cambodia by American troops were fired upon, four students were fatally injured. Numerous personal injury and wrongful death actions were consolidated for trial. The district court restrained "all parties concerned with this litigation, whether plaintiffs or defendants, their relatives, close friends and associates ... from discussing in any matter whatsoever theses cases with members of the news media or the public", p. 239.

The Sixth Circuit found that CBS had standing to question the validity of the order because it was clearly injured on the face of the order and the order affected the first amendment right of CBS to gather news. In vacating the order, the Sixth Circuit finds the order is a prior direct restraint upon freedom of speech suffering from vagueness and overbreadth. The court concludes that there was "no substantial evidence" to show that "a clear and imminent danger to the fair administration of justice existed because of publicity". The presumption against the constitutional validity of the order had not been overcome.

This court joins with Judge Berrigan in *U.S. v. Davis,* supra, at p. 567, n. 1, and the Second Circuit in the *Dow* case, in disagreeing with the CBS case. The Sixth Circuit's view overlooks the realities of the situation. When the party directly affected has chosen not to assert his First Amendment rights, a third party should not be able to assert those rights indirectly. As Judge Berrigan notes, the Second Circuit declined to follow the Sixth Circuit's lead. See *Application of Dow Jones & Co.,* 842 F.2d at 609.

**7.** *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), involves judicial orders prohibiting the news media from publishing and broadcasting accounts of confessions or admissions made by an accused in a murder case that had attracted widespread news coverage. The petitioners before the Supreme Court were several press and broadcast associations, publishers and individual reporters directly affected by the orders.

In *New York Times Co. v. U.S.,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), the United States sought to enjoin the New York Times and the Washington Post from publishing the con-

tents of a classified historical study on Viet Nam policy. This is a classic case of a prior restraint directly imposed on the press.

*Ruggieri v. Johns–Manville Products Corp.,* 503 F.Supp. 1036 (D.R.I.1980) involves a "highly publicized" asbestos case where counsel for plaintiff appeared on a nationally televised show and indicated that asbestos manufacturers knew of the dangers of asbestos inhalation as early as 1935 and let thousands of people die. Raybestos–Manhattan sought to disqualify the plaintiff's counsel from participating in any asbestos litigation and to prohibit his extrajudicial comments concerning such cases. Counsel for plaintiff apparently refused to step aside or refrain from making further comments, as the court declined to prohibit counsel for plaintiff from continuing to discuss the "very controversial issue of asbestos inhalation".

*Smith v. MCI Telecommunications Corp.,* 1993 WL 142006 (D.Kan.1993) arises from the settlement of a class action for breach of contract and fraud. The defendant moved for a confidentiality order on the parties prohibiting the disclosure of the settlement terms. Plaintiffs objected on the grounds that confidentiality was not included as a part of the settlement agreement and on the basis of the first amendment. The court denied the motion in view of the strong presumption of constitutional validity that applies to prior restraints. Just like the *Pansy* case, discussed supra, this case is distinguishable as it involves a settlement agreement as opposed to a proposed desegregation plan.

*Kemner v. Monsanto Company,* 112 Ill.2d 223, 97 Ill.Dec. 454, 492 N.E.2d 1327 (1986) involves 22 consolidated cases arising from a railroad-tank-car derailment in Missouri. Monsanto was made defendant as the manufacturer of dioxin, a chemical that leaked from the tank car. The circuit court on motion of the plaintiffs entered an order prohibiting Monsanto from communicating with media concerning the case during the progress of the trial. Monsanto, the party directly affected by the order, appealed, claiming that the order was a prior restraint.

Intervenors additionally cite *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991), and *U.S. v. Salameh,* 992 F.2d 445 (2nd Cir.1993). Both of these cases are thoroughly discussed by Judge Berrigan in *Davis,* supra, 904 F.Supp. at 567–568, and are readily distinguishable for the reasons stated therein.

Under the circumstances of this case, the court finds that the order is necessary to afford the members of the School Board a realistic chance at arriving at a proposed desegregation plan. True, as counsel for intervenors points out, this is not a criminal case where the rights of the accused to a fair trial may outweigh the rights of the news media. But that is not to say that this is a run-of-the-mill civil action. This is a highly sensitive and controversial matter within the Parish, having a broad impact on those it touches.

The scope of a district court's equitable powers to fashion equitable orders in desegregation cases has long been established. *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The essence of equity jurisdiction is to empower the court to do equity and to "mould each decree to the necessities of the particular case". Id, 402 U.S. at p. 15, 91 S.Ct. at p. 1276.

It is not an overstatement to say that this is an extraordinary case—one which seeks to validate the constitutional rights of people whose skin happens to be black. It is well established that in such extraordinary cases, federal district courts are vested with the authority required to accomplish the constitutional end. This court has been called upon to exercise the "qualities of mercy and practicality" and balance the individual and collective interests. *Id.* The court has attempted to do that here. The necessity for the order clearly outweighs the "amorphous 'hope to hear'" rights of the news media.

The court further finds that there are no practical alternatives that would effectively safeguard the Board's progress in bringing this matter to a conclusion after forty years. Contrary to what intervenors have repeatedly stated, the public (and the press) will be afforded a full and fair opportunity to review and comment on any proposal submitted to the court, both before its submission and before court action.

Accordingly, the motion by intervenors to vacate the "gag order" is denied for the reasons stated in open court as supplemented herein, except as set forth in footnote 5.